In re BEACH.

(Supreme Court, Appellate Division, First Department. December 10, 1897.)

1. INSANE PERSONS—APPOINTMENT OF COMMITTEE—PROCEDURE.
    If, in a proceeding for the appointment of a committee of an alleged incompetent person, the petition and accompanying proofs make out a presumptive case, within Code Civ. Proc. § 2327, the court should order the inquiry as there provided, unless it is clearly made to appear that there is no ground for the allegation of the petition.

2. SAME—SUFFICIENCY OF EVIDENCE.
    Such a presumptive case is made out where it appears that, in accordance with advice believed by the alleged incompetent person to have been given him by the spirits of deceased persons, he is about to dispose of property away from the natural objects of his affection, in favor of a "medium" through whom the advice has been received.

In the matter of Harriet E. Beach, an alleged incompetent person. From an order denying an application for a commission to inquire as to such incompetency, Jennie Beach Casper appeals. Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, and INGRAHAM, JJ.

Elihu Root and W. H. Hamilton, for appellant.
Lyman E. Warren, for respondents.

INGRAHAM, J. A petition was presented to the special term of this court by Frederick C. Beach and Jennie Beach Casper, the only children of Harriet E. Beach, alleging that the said Harriet E. Beach "is, and for a number of years last past has been, of unsound mind, and a person incompetent to manage herself or her affairs, in consequence of lunacy, loss of understanding, and other causes," and asking that a commission issue to inquire as to her apparent lunacy or incompetency. There were annexed to this petition affidavits of the petitioners and others, and a series of letters written by Mrs. Beach to her children and others. In answer to this petition, there were presented the affidavits of various persons who had known Mrs. Beach during the past 10 years; also the affidavit of Mrs. Beach and

of one Rogers, to whom it is alleged Mrs. Beach has been married since the death of her late husband, in Europe. Upon these affidavits the court below denied the motion for a commission, the learned · justice giving as a reason that he had read over the papers submitted, and was satisfied that, upon the strong preponderance of the evidence, "the respondent should not be subjected either to the appointment of a committee of her estate, or the humiliation of a proceeding to inquire into her mental soundness before a jury." The application was made under the provisions of the Code of Civil Procedure providing for the appointment of a committee of a person incompetent to manage himself or his affairs.

By section 2320 it is provided that:

The "jurisdiction of the supreme court extends to the custody of the person, and the care of the property, of a person incompetent to manage himself or his affairs, in consequence of lunacy, idiocy, habitual drunkenness, or imbecility arising from old age or loss of memory and understanding or other cause." Laws 1894, c. 504.

By section 2327 it is provided that:

"If it presumptively appears, to the satisfaction of the court, from the petition and the proofs accompanying it, that the case is one of those specified in this title, and that a committee ought, in the exercise of a sound discretion, to be appointed, the court must make an order directing either, that a commission issue, as prescribed in the next section to one or more fit persons designated · in the order, or that the question of fact arising upon the competency of the person with respect to whom the petition prays for the appointment of a committee, be tried by a jury at a trial term of the court."

The somewhat unusual proceeding was taken in this case of submitting affidavits and proof on behalf of the person alleged to be incompetent, and determining the question of such incompetency upon such affidavits, rather than upon a trial either before a sheriff's jury or before a jury at a trial term of the court, the tribunal indicated by the provisions of the Code as the one to determine that question. By section 2325 of the Code the proceeding to be followed upon the presentation of such a petition is prescribed. There it is provided that the petition must be accompanied with proof by affidavit that the case is one of those specified; must set forth the names and residences of the husband or wife, if any, and of the next of kin and heirs of the person alleged to be incompetent, as far as the same are known to the petitioner, or can with reasonable diligence be ascertained by him, and also the probable value of the property possessed and owned by the alleged incompetent person, and what property has been conveyed during said alleged incompetency, and to whom; and the court must require notice of the presentation of the petition to be given to the husband or wife, if any, or to one or more relatives of the person alleged to be incompetent, or to an officer specified in the preceding section. There is no provision in the Code for notice to be given to the alleged incompetent person, nor does it appear that it was the intention of the legislature to prescribe a trial as to the competency of one against whom proceeding is taken upon such preliminary application. The provisions of the Code are that the court must appoint commissioners to preside at the trial before a sheriff's jury, or make an order that the question of fact arising upon

the petition be tried by a jury at a trial term of the court.   A very slight acquaintance with proceedings of this character will show that affidavits made by one alleged to be incompetent, or by persons surrounding him, where there is no possibility of cross-examination, can be of but little use in determining the very delicate questions which are often presented upon an inquiry into the mental condition of one alleged to be incompetent, within the meaning of this provision of the statute.   To justify any order, however, it must presumably appear, to the satisfaction of the court, from the petition and the proof accompanying it, that the person against whom the proceeding is instituted is a person incompetent to manage himself or his affairs, in consequence of lunacy, idiocy, habitual drunkenness, or imbecility arising from old age or loss of memory and understanding or other cause.   When such a state appears by such petition and the accompanying proof, a case is made out where the court should order the inquiry to be made in one of the methods required by the section of the Code before referred to, unless it is clearly made to appear that there is no ground for the allegation of the petition.   This application is made by the children of Mrs. Beach, those who are closest to her by blood, and who presumably would be the ones most interested in her welfare.   It certainly is not to be presumed, in the absence of evidence, that her children are actuated by mercenary motives in making such an application.

From the petition presented it appears that Mrs. Beach is now 69 years of age; that she resided with her husband, the father of the petitioners, in this city, until his death, intestate, on the 1st of January, 1896; that the property of Mrs. Beach consists of an interest in the personal estate of the father, valued at about $27,000, and the dower interest in the real estate of which her husband died seised, valued at about $195,000, but from which no income is realized over and above that necessary to pay taxes and assessments, interest on mortgages, and insurance premiums; that, in the summer of 1896, Mrs. Beach went to Europe, where she still resides, traveling from place to place, and that, at the time the petition was presented, she was at Venice, Italy; that Mrs. Beach, in January, 1897, at Alexandria, Egypt, intermarried with one Henry Rogers.   It further appeared by the petition and accompanying papers that Mrs. Beach had been twice in the asylum for the insane, in consequence of her mental condition; that she was first sent to an asylum in the year 1855, when she was placed in an insane asylum at Hartford, Conn.; that subsequently, in December, 1890, she was placed in the Bloomingdale Asylum for the Insane, and remained there until May, 1891, when she was discharged from said asylum upon habeas corpus.   Mrs. Beach has been for several years a spiritualist, believing that she was in constant communication with the spirits of deceased persons; and the person that she has since married is also a spiritualist, and had acted as the medium through which she received the communications from the spirits.   His affidavit is annexed to the papers in opposition to this application; and, from it, it appears that he is 52 years of age, some 15 years younger than Mrs Beach.   He alleges that since 1886 he and Mrs. Beach had been on very friendly terms; that he left New

York shortly after Mrs. Beach, in 1896, arriving in England about August 1st of that year; that, in the following September, Mrs. Beach explained to him the position she was in with her family, stating that she was in fear that her son and daughter would attempt, in order to obtain the control of her share in her husband's estate, to harass and annoy her, or to take lunacy proceedings, or to do something to force her into an arrangement by which the capital of her fortune would be taken from under her control, and that she would not receive the full income due to her. The affidavit then proceeds to say that "she considered and I thought that she ought to have some one who could attend to her wants, and see her through the embarrassments of travel; and, having known her for many years, I consented, and we left England early in September, 1896, and visited France, Italy, Egypt; and Greece under an arrangement that I was to travel with her." The result of this arrangement, by which this woman, 69 years of age, started to travel with this man, of 52 years, as a person who could attend to her wants, and see her through the embarrassments of travel, and prevent her children from making an arrangement by which the "capital of her fortune would be taken from under her control," ended with marriage in the following January, at Alexandria, away from all her relatives and friends; and her letters to her children and others, relating to the marriage, to which reference will hereafter be made, certainly show a mental condition quite abnormal.

Rogers, in his affidavit, says that, except as to the disputes with her children about money affairs, Mrs. Beach felt very affectionately towards them. He says that she is perfectly sane. "She is no doubt an ardent investigator of spiritualism, and student of reforms for women; and, in the discussions on these subjects which she has had with various persons during her travels, she always left them interested, and many thanked her for the views she had expressed." "During the period of our traveling, I have seldom referred to the subject of spiritualism, and have used no improper or other influence over her, such as is suggested in the petition and evidence." He also swears: "I have not used any such influence with my said wife, either before or after marriage, in connection with her affairs or as to our marriage. We married after mature deliberation by both of us, I honestly believing I could be of benefit to her, and she acted entirely of her own free will in accepting me as her husband and companion." The unselfish motive of Rogers in contracting this marriage is made evident when it is seen that he proceeded to assist her in preventing her children from forcing an arrangement to protect the capital of her property by getting some instrument which transferred the capital to himself. Mrs. Beach, in her answering affidavit, recites the dispute with her children about her money affairs, stating that the average remittance to her was about $500 a month. She describes the circumstances under which she was placed in an asylum in Hartford, Conn., in 1855; describes her sickness in 1886; and alleges that in 1890, on account of a disagreement with her late husband, because of his desire to oppose her "investigating certain seeming phenomena of spiritualism," he caused her to be taken to the Bloomingdale Asylum, under the advise of Drs. Satterlee and Corning. She then describes her relations

with Rogers, whom she says she has known since 1886. She says that after she arrived in Europe she arranged that "Rogers and his then wife" should accompany her in her travel. Neither Rogers nor Mrs. Beach states what disposition was made of his "then wife"; but on the 26th of the following January, after he started with her as a traveling companion, they were married. It is alleged in the affidavits accompanying the petition that, during the time that Rogers was thus acting as a traveling companion, his wife had instituted proceedings against him for divorce, on the ground of adultery; and that on January 6, 1897, a judgment of divorce was entered in this state, by which Rogers' wife obtained a divorce from him upon that ground. It is further alleged in the affidavits that Mrs. Beach, about the time of this marriage ceremony between herself and Rogers, executed a paper, in the nature of a trust deed of all her property to the said Rogers, in form giving to him absolute control and authority over the same, without any consideration therefor; and neither Mrs. Beach nor Rogers, in their answering affidavits, refers to this instrument, or in any way denies that such instrument had been executed.

Now, turning to the letters written by Mrs. Beach to her children during the time that Rogers was with her in the capacity of traveling companion, and down to the time of her marriage to him, it is seen that there is presented the case of a woman either acting or pretending to act under what she believes to be the advice of her mother, her late husband, and other deceased persons, who she believed were having communications with her. She speaks again and again of her first husband's wishes that have been communicated to her. She says in one letter that he (her deceased husband) wants to have her part of the estate portioned off, and for her to use it as she liked, principal and interest, payable as she desires, and that her two children are to sign a paper to that effect, "do away with power of attorney altogether, and have a deed of trust for one I select to act for me. It makes him very unhappy if I refuse, or if I insist on carrying out what was found in his writing, unsigned by himself." Again, she refers to the sanction of her late husband to this marriage with Rogers; and in her letters she speaks of the deed of trust that she is to, or has, executed to her present husband, to act for her. She speaks of her marriage as being a "spiritual wedding," which is a new form of marriage, and which she is to organize, leaving women "free and independent to separate from men if love ceases"; and says that "through this avenue motherhood becomes sacred, and childhood sacred, and illegitimacy will cease in time to exist"; and refers to the approval that she has received from her mother and her late husband. In another letter, written about the same time to a Mr. Perkins, she speaks of communications received from Daniel Webster, Rufus Choate, and Abraham Lincoln in relation to her new project, showing that she believes that she is acting under their advice and counsel. She says that from September until January, 1897, there have been plots and counterplots about her. She says:

"I faced the world visible and invisible, and obeyed my mother and Webster; went to London with legal proceedings and testimony of a doctor; placed myself so my son, as heir, or Jenny, could not abduct me by force. The

demon played through my son and grandson Stanley, but Jenny was stanch and true and a noble girl. At last she took a stand for her mother, and Fred could do nothing as administrator without. her consent. Her father worked through her; could not with Fred. Satan entered into Fred and Stanley."

She refers to her marriage having been entered into with the sanction of her mother and her first husband, and says that her first husband had asked Rogers' pardon for misjudging him as he had done in the past; that she had adopted a formula which others would adopt in the coming century. In the succeeding June she was to have a "spirit wedding," and hoped that Henry Ward Beecher would come and perform the ceremony. She was to have a grand jubilee, to which she wished her friends to come, and was to appropriate a certain amount to pay the fare of those that could not afford to pay. She speaks of Rogers' divorce, and says that Mrs. Rogers had written to say that she was going to take measures for a divorce, but would do nothing to disgrace him, and says of her (Mrs. Rogers), "She fell in with a scoundrel lawyer." She then proceeds: "We all have followed spirit direction. * * * The guides kept telling me she (Mrs. Rogers) would come when I left London, and I expected her in October, by way of Genoa." She refers all through her letters to her father, mother, and her deceased husband, and says that Rogers is her mother's selection as her husband; that she and Rogers have a spirit work to do together; and says that he (Rogers) or her first husband "will now enter his spiritual career (the inventor's sphere), and be still more so in futurity; and my Ivanhoe—my image —is engraven upon his soul forever as his savior, and fought his false fate, and now for him his true earth destiny, and secured his future spiritual destiny for all futurity. It can never be taken from him or me. I triumph over fatality through his life, for he had it in full." And she closes this letter by saying: "I will have settlement of estate, and plenty of means this year to carry out my undertakings." Again and again she refers to her marriage with Rogers as being her mother's choice.

No one can read these letters without being impressed with the fact that this woman was not acting upon her own intelligent judgment, but under what she assumed, or was induced to believe, was the advice of the spirits of those who had been near to her; that she received messages from her husband, father, and mother as to the disposition that she should make of her person and property, and was apparently doing her utmost to carry out those directions, under the belief that this man whom she had married had been chosen for her by her deceased parents and husband, and that, in marrying him and acting as she had acted, she was carrying out the wishes of those whom death had vested with supreme intelligence and power. All this is not denied. She nowhere denies that she received these revelations, and that she had been controlled in her actions by messages received from the dead. · She produces the affidavits of persons that have known her, and transacted business with her, as to her apparent sanity in the conduct of her business; but none of these affidavits, upon which the main feature of her case depends, refer to the control that alleged communications from spirits

were exercising over her as to the disposition that she was to make of her property, and the control of her life. It is true that a belief in spiritualism may be consistent with good business instincts and sound judgment; and the mere fact that a person is a believer in spiritualism would not of itself justify an inference that such person was incompetent to manage himself or his affairs. When, however, it appears that, in addition to a belief in spiritualism, a person has become so convinced of the reality of communications from the dead that the control of his person and the disposition of his property are governed by the advice and directions contained in these communications from deceased persons, and that a person under such influence is about to dispose of his property or to contract a marriage or other relations which appear to be unwise or unusual, according to the accepted standards, and that the assumed communications from such deceased persons have come through the mediumship of the person who is to benefit by such advice, arrangements, or disposition of property, it seems to me that a case is presented which calls for an investigation as to the competency of such person. It is not the abstract belief in spiritualism that raises the presumption of incompetency, but the fact that a person has surrendered his will to the control of such influences rather than to the exercise of sound judgment. And, when it appears that those influences are being used to procure a disposition of property to others than her children or those to whom it would naturally go, a case is presented which, at least, requires an investigation by the tribunal provided to determine questions of this character.

It is said that, as Rogers is now Mrs. Beach's husband, it is but natural that she should consult with him and follow his advice as to the disposition of her property; but it here appears that the selection of Rogers as her husband was the result of the communication of the wishes of those that were dead, and she states again and again that in the disposition which she had made, or was about to make, of her property, she was acting under similar communications. It is unnecessary, nor would it be proper, to determine that upon this record there is exhibited a case of such incompetence as would justify the appointment of a commission to care for Mrs. Beach and her property; but we think it is the duty of the court, if it presumably appears from the petition and proof accompanying it that the person proceeded against is a person incompetent to manage himself or his affairs, to order an investigation as to whether or not such incompetency exists, and that this was a case which required an investigation before the tribunal provided by law for that purpose to have the question of Mrs. Beach's competency fully inquired into.

I think the order appealed from should be reversed, and the motion granted. All concur, except PATTERSON, J., not voting.