## MABELLE RAWSON HIRONS *v.* JULIAN B. HUB-BELL.

*Fraud—In Procurement of Conveyance—Spirit Communica-*
*tions.*

The evidence establishing that certain transfers were made by plaintiff to defendant for no consideration whatsoever, and merely by reason of communications to plaintiff, through defendant, acting as medium in a simulated trance, which purported to come from a deceased friend of plaintiff, and directed him to make such transfers, *held* that the transfers should be annulled.                                      pp. 595-607

The *prima facie* meaning of an unsealed receipt is always open to explanation, and the averment of the receipt may be shown to be false.                                      p. 605

Belief in spiritualism is not sufficient to establish incapacity to make a valid deed.                                      p. 606

The defense of laches is not available where the actual situa-tion has been concealed by the artifice of the party asserting laches, and the injured party has acted promptly on the dis-covery of the actual facts.                                      p. 607

*Decided January 14th, 1926.*

Appeal from the Circuit Court for Montgomery County (URNER, C. J.).

Bill by Julian B. Hubbell against Mabelle Rawson Hirons.. From a decree for plaintiff, defendant appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON,. ADKINS, OFFUTT, and PARKE, JJ.

*Harry E. Karr* and *Clarence W. Perkins*, with whom was· *Francis K. Murray* on the brief, for the appellant.

*Robert Peter, Jr.,* and *Albert N. Bouic*, for the appellee.

PARKE, J., delivered the opinion of the Court.

The bill of complaint was filed in this cause on September· 21st, 1920, by the appellee, Julian B. Hubbell, to compel the appellant, Mabelle Rawson Hirons, to reconvey and. transfer to the appellee valuable real and personal property received by her from him, and to account for the rents· received, on the ground that the property had been obtained from the appellee by means of fraud and undue influence· practiced and exercised upon him by the appellant. The· answer of the appellant denied the charges preferred by the bill of complaint, and asserted that the transactions assailed. were for a good and valuable consideration. After the tak-· ing of the testimony, the parties were heard, and a decree· was passed granting the relief sought by the bill of complaint, and this appeal was then taken.

The appellee, Julian B. Hubbell, was about sixty-seven. years old when the assailed transactions occurred, and the property involved is mainly what came to him through his· association for over thirty years with Clara Barton, whom he first met in 1876. He was her secretary, companion, and. physician, while she was engaged in establishing the American National Red Cross in the United States, of which she was the president for twenty-three years, and while she was· pursuing her other humanitarian work, and during the:

period of these services, he received no regular compensation. Miss Barton lived on her property at Glen Echo, Montgomery County, from 1897, but she had conveyed it to the appellee several years before her death in 1912; and the appellee, who was unmarried, continued to live on the property alone.

After Miss Barton's death, the appellee had conceived the idea of the erection on the property at Glen Echo of a memorial in honor of Clara Barton, and was endeavoring, with indifferent success, to attain its accomplishment through financial contributions, when he was visited by a widow, Mabelle Rawson Hirons.

The home of Mrs. Hirons' father in Oxford, Massachusetts, adjoined the summer residence of Miss Barton, and Mrs. Hirons knew Miss Barton and the appellee. She was familiar with the fact that Dr. Hubbell had been Miss Barton's secretary for many years and was her devoted friend, and aspired to found an institution as a memorial to Clara Barton's memory and bearing her famous name. At the time of her visit, Mrs. Hirons was about forty-two years old, well educated, a fluent and entertaining conversationalist, handsome, magnetic, and with the manner and bearing of a woman of the world. She came, without invitation or announcement, and was met at the door of the residence by Dr. Hubbell. From this point, the testimony of the visitor and of her host are in direct conflict on every material issue of fact.

The Court has carefully read, weighed and considered all the testimony and exhibits from every angle, and with particular reference to the points presented by counsel for the appellant in their oral argument and on their brief. The Court is impressed with the difficulty of reconciling some of the evidence, and of accounting for some of the features of the proof, but this difficulty is not confined to the testimony offered by one side, but occurs in that offered by both the appellant and by the appellee. The appellant's veracity was assailed by fourteen witnesses of the neighborhood, who testified that from her general reputation they would not

believe her on oath, and eight other witnesses affirmed that·
she had a good reputation for honesty and integrity. The·
appellee's reputation was not directly assailed, but on his·
own admissions he had treated the solemnity of an oath with,
but scant respect in former legal proceedings. He frankly
confessed the wrongful nature of his acts, while he attrib-
uted them to his complete obedience to the express commands·
of Clara Barton as revealed to him by the appellant. How-
ever, after giving full effect to every fact affecting the credi-
bility and weight of the testimony on the part of the appellee,.
we have no hesitancy in concluding, with the able and expe-
rienced chancellor below, that the appellee fully established
his cause by the preponderance of proof.

The proof showed conclusively that Clara Barton and Dr..
Hubbell believed in spiritualism, and had been in the habit.
of seeking advice in their personal and business affairs from·
the dead through messages conveyed by mediums. Although.
denied by Mrs. Hirons, the evidence has convinced the Court·
that Mrs. Hirons was aware, before her visit, that Clara·
Barton and Dr. Hubbell were spiritualists, and that, with
this knowledge, Mrs. Hirons visited the home of Dr. Hubbell·
on Sunday, May 3rd, 1914, and told him that her father·
had asked her to call and find out how he was getting along.
and what was being done towards the building of a memorial
in honor of Clara Barton, who had been dead two years;
and that her father did not want her to come back until she·
had obtained this information. After some discussion of·
the memorial contemplated by Dr. Hubbell, he was so im-
pressed by her enthusiastic endorsement of his undertaking·
and by her evident desire to co-operate in its accomplish-
ment, that the appellee invited Mrs. Hirons to remain and
help him in his plans. She agreed and stayed in his home
from the day of her arrival. At this time William H. Sears,.
an attorney of Washington, was visiting Dr. Hubbell. Ac-
cording to the evidence of the appellee, on the Sunday even-
ing Mrs. Hirons came, while they were alone together, a re--

markable scene was enacted, which Dr. Hubbell described in this manner:

"While we were alone, after these conversations about the memorial, Mrs. Hirons said, 'I see Miss Barton standing over there. Can't you see her?' 'No,' I said, 'I don't.' 'She seems to be trying to speak to you. Wait a minute,' and then began twitchings of the muscles of her arms, body, limbs, growing more and more violent, and then a deep breath, and apparent unconscious state. After a little waiting, she began to force whispers. 'Doctor, doctor'—only this was very feeble, remember—'Listen, I have brought her to help you carry out your memorial plans. I have worked hard two years to get her away from her family, to bring her to you. You must be good to her, or she will not stay. If you work with her, you will succeed. If you do not, you will fail. She loves the home, as I do, and will work with you heart and soul. She has great powers which you cannot understand now, but will see later. If you are not good to her, she will not stay. If you oppose her you will fail. All those who oppose her suffer. Remember what I say. It is hard for me to use her. It will be easier as she learns. Waken her carefully. The heart may stop. Rub her hands gently, then her arms, then her right shoulder and right side of her neck. Then she said, 'Oh, oh, what are you doing? What is the matter with my neck? What are you doing to my neck?' Then, 'Have I been asleep?' I said, 'Yes, Miss Barton has been talking.' 'What did she say,' Mrs. Hirons said. She said, 'She has brought you here to help me carry out my memorial plans.' 'Is that all she said?' 'No,' I said, 'She said I must be good to you, and you would be good to me.' 29-Q. Was that all that occurred at that time? A. Yes. I might say that I helped her to lie on the couch and she was resting, went out to do my chores that had been neglected, feed and milk the cow, as I was keeping bachelor's hall."

The following morning Mrs. Hirons went with Sears to inquire about securing additional land for the memorial site;

and, on her return, assumed and dischaged the duties of a
housekeeper, became ill, and was confined to her room for
three days, with the appellee preparing and carrying her
meals to her. On the evening of the third day she fell into
another trance while she and the appellee were alone. The
whole episode is portrayed by the appellee's testimony.

"Now, after that was there anything unusual that oc-
curred? A. On the evening of this third day, Mrs. Hirons
said again, 'I see Miss Barton standing over there' and again
she asked me if I did not see her. I said 'No.' Again she
said, 'She wants to speak with you.' The twitching and jerk-
ings of the muscles and of the body were similar to the first
trance. After taking the deep inspiration she said, 'Doctor,
I am glad that you are being good to the little one. I have
brought her here to help you. She has great wealth and con-
trol of great wealth. John T. Clark is devoted to her. If
she marries him, she will not stay. She will go away. To
keep her here you must put your property in her name. If
it is in her name she will stay, she will put her property in,
and all that Clark will give her. You must listen to her.
If you do not, you will fail. Again, I say, if you oppose her
in any way you will fail. Those who oppose her suffer.
Remember what I say. She is devoted to the old place and
will work hand in hand with you for your memorial pur-
pose. I have worked hard to bring her here. I will use no
other person to communicate with you. No one must know
that she is a medium. If this were known her power would
be lost. You must go to Mrs. Warneke no more. Keep no
diary. I must use her no more now. She is getting weak.
The life stream will break easily. Waken her gently as you
did before.' After coming to consciousness again she said,
'Have I been asleep ' 'Yes,' I said, 'And Miss Barton has
been talking.' Mrs. Hirons said, 'What did she say?' I said
that you had come to help build the memorial, that John T.
Clark would put in his help, for you, that I must put all
my property in your name to secure the co-operation of
Clark. 'Did she ask that?' Mrs. Hirons asked, and I replied,

'Yes.' 'Well,' Mrs. Hirons said, 'The doctors all say that I have diabetes, and can live but two years. If the rest of my life can be used in building a memorial to Clara Barton I will feel that it has not been wasted. I am willing to accept the responsibility that she requests or directs you to put in my hands, if you feel so disposed.' I said, 'When Miss Barton was living I always followed her directions or suggestions as far as I was able, and I have not changed since she has passed on, and I am willing to do as she says.' Mrs. Hirons said, 'I am glad to hear you say that, doctor, we will join hands and make here a memorial to Clara Barton that shall be to Glen Echo what Mount Vernon is to George Washington, only that, being nearer Washington, it will be visited by more people who honor and love Clara Barton. I think we ought to begin at once to carry out the plans that are already in mind. 32-Q. Did she say anything during the trance as to what name you would be called? A. She did. She says, 'Doctor, I will call her "the little one" and I will call you "Lola," but you must not write nor speak this name. When I say 'Lola' and press my finger on your wrist three times, you will know that I am with you.' 33-Q. Did she say anything to you about her mediumship? A. Yes, after this second seance she said, 'I never knew before I was a medium, but when I was a child, I remember telling my mother that she would attend the funeral of her father in two weeks, naming the day. Her father then was in perfect health. She attended the funeral as I had predicted."

The appellee testified that, at the time of the appearance of Mrs. Hirons, his efforts to enlist support in his plan to build the Clara Barton memorial had not been successful; and that the entrance of the appellant, with her representations of her own wealth and of her ability to command whatever other funds might be necessary for the consummation of his cherished project, seemed to him providential and he had no reason to doubt the genuineness of these statements or the existence of her resources. He and Clara Barton

were believers in spiritualism and in the power of the undying dead to communicate to the living through the aid of a medium. He accepted the message as being the injunction of his late friend and patroness, and in obedience to her will he informed Mrs. Hirons that he would convey his property to her in order to secure the perpetuation of the name and fame of Clara Barton. Mrs. Hirons' reply was: "Doctor, I am very much pleased that you have taken this step. We will work together here, heart and soul, and we will begin at once, and on the banks of the Potomac here with the old home, we will make an ideal spot for the world to visit. I wish to begin at once, and I know you do."

The appellee lost no time, but directed his friend, General Sears, to draw the deed conveying all his real estate, which the appellee estimated to be worth sixty thousand dollars, less mortgage liens of about ten thousand dollars. This deed was executed on May 14th, 1914, in Washington. As a consequence of another trance, and for the purpose of giving Mrs. Hirons "better control and a feeling of absolute independence in carrying on the work," Dr. Hubbell was directed by the spirit of Clara Barton to give by bill of sale "all the private papers of the late Clara Barton that were given to said Julian B. Hubbell by said Clara Barton in her lifetime, and also all the household and kitchen furniture, plate, pictures, carpets, rugs and tapestries, and ornaments, and all other personal property of every kind and description belonging to the said Julian B. Hubbell, and now in the Clara Barton Home, Red Cross Station, Glen Echo, Montgomery County." The bill of sale included a cow, the poultry, tools, implements, lumber and all other personal property of every kind and description on the premises, and closed the enumeration with the declaration "it being the intention of the said Julian B. Hubbell to sell all of the personal property in said house, however acquired by him, whether from the said Clara Barton or his own family." This bill of sale was executed at Rockville on May 20th, 1914, and it and the deed for the real property were both recorded on that day. In addition,

the appellee gave to appellant water bonds of the town of Glen Echo in the par value of $4600, and other claims and monies aggregating a large amount. The appellee testified positively that he never received a cent by way of consideration.

After the property was so transferred, the appellee and appellant continued to live at Glen Echo, and solicited contributions for the purpose of the memorial. According to the appellee's testimony, the money received was given to Mrs. Hirons. She dealt with the property as her own, selling and conveying lots and collecting the rents; and placed mortgagees, aggregating $5300, on the land. When the appellee remonstrated she informed and quieted him by the statement that she was merely carrying out the will and judgment of Miss Barton, who had explained to her that if the land sold were ever desired, it could be obtained for less than the amount for which it was sold. The appellee testified that his confidence in the appellant and in the verity of her communications from Clara Barton continued unshaken until about the first of May, 1920, when he overheard Mrs. Hirons inform a visitor that she had come to build a memorial to Clara Barton, but since her arrival she had found papers in the house that had convinced her Miss Barton was unworthy of a memorial, and that she had abandoned the project and was going to take care of herself. The appellee testified that he was shocked by this avowal, and began at once to make preparations for the recovery of the property from the appellant in order that it might be dedicated to the memorial as originally planned. The bill of complaint was filed in the following September. The appellant then made the appellee leave, with nothing but a few articles of personal wear.

The principal facts in the testimony of the appellee are substantiated by the evidence of witnesses who were in a position to observe the conduct of the appellant, to hear her admissions and statements. No witness knew all the facts, but when the fragments within their knowledge are assembled

they compose a complete narrative in essential accord with
the testimony of the appellee. It would serve no useful pur-
pose to point out the particular testimony of the witnesses
that give to the appellee's case the necessary preponderance
of proof, but a brief reference should be made to the appel-
lee's defence.

Her reply to the accusations of the bill of complaint is
that she bought all the property she obtained for eleven
thousand dollars and paid for it in cash on the day of the
execution of the deed, when she received a receipt for ten
thousand dollars as a payment in full for the land and the
water bonds. This statement is not only explained and con-
tradicted by the appellee, but by disinterested witnesses, who
heard her admissions and declarations that she had paid the
appellee nothing. Moreover, it fails of its inherent improb-
ability. She had not previously examined the real estate and
knew nothing of its value at Glen Echo. Her information
was obtained on the day after her arrival, when she went
out for a walk in Glen Echo with Dr. Hubbell. It was a
brief walk through the town, and she testified "After walk-
ing along I stated to him that I would pay him $10,000 for
all this, all his holdings there. He told me about his water
bonds, that he owned them, and $1000 for his personal prop-
erty." Her statement was that he gladly accepted this offer
so casually put, and the sale was made. She had made a
most cursory inspection of a portion of the properties at
Glen Echo and was practically without any reliable informa-
tion as to the extent, value, or nature of the tracts. She
explained that she had been looking for a suburban home,
and that the appellee was in financial distress and the im-
provements, which she saw, in great need of repair. All
this is an inadequate explanation of a bargain and sale so
unexpectedly and instantly made, when the appellee esti-
mated the real estate alone to be worth $60,000, and when
his financial distress could have been relieved by a much less
drastic remedy and sacrifice, as the liens on the land were
between $8,000 and $10.000. In addition, there were the

Glen Echo bonds, which were assumed to be worth $5,000, the personal property which was assessed at $2,000. At the time of the alleged transaction the real estate and improvements were assessed at $39,460, with no value assessed against the unimproved portion of the property. And she paid for all this property in cash in a long envelope.

Her deposition was that her property was in the possession of a Charles L. Dundy, living in Omaha, Nebraska, who succeeded Henry W. King as her agent. She was urgently asked what property she had in Dundy's possession, but she was unable to name a single item or amount except some uncut rubies, a clock and pieces of jewelry. She merely wrote him from Glen Echo to meet her in Glen Echo or New York with $12,000 and wrote a second time to make the meeting place New York. He obeyed the summons, met her in New York on May 13th, and brought the money to her "in a large envelope," which she carried by night from New York to Washington, and then to Glen Echo, and on May 14th to the Washington Loan and Trust Company, in Washington, where, in the presence of Judge Ashley M. Gould, she delivered the long envelope, with its eleven thousand dollars in notes, to appellee. It is unfortunate for her statement that Henry W. King is dead, and Charles L. Dundy is dead, and Judge Gould is dead; and it is unfortunate for her that she did not follow the less expensive and customary course of having the money remitted instead of having it brought in an envelope by messenger from Omaha, but more unfortunate, perhaps, is the fact that his court records established that Judge Gould was apparently sitting in his court during the period Mrs. Hirons was at the Washington Loan and Trust Company. Another significant incident is that she paid over the money without receiving the water bonds, which were taken in the purchase as representing five thousand dollars, and still another is that, although the Washington Loan and Trust Company was the appellee's only bank of deposit, no proof was offered of the deposit of the money; nor explanation of why the deposit

was not made nor of what became of the funds, although the evidence of the appellee's impoverished circumstances is at variance with the possession of any such sum.

It is impossible to give credence to the appellant's theory of an unconditional bargain and sale by the appellee, that at once stripped him of practically everything he owned, at a grossly inadequate price, and defeated his cherished project in honor of his venerated patroness, Clara Barton. And this conviction is strengthened by the testimony of William H. Sears, an attorney, who was visiting the appellee at the time of the transaction, and who testified that Mrs. Hirons never left the Glen Echo residence, and told him on his return in the evening that she had bought the real estate for $50,000, the personal property and the bonds for $10,000, and that she had "made the payment in gilt-edge securities, which Dr. Hubbell had deposited in a safe deposit box at Washington Loan and Trust Company; that she was to pay Dr. Hubbell $100 per month to remain with her and assist her with the Clara Barton memorial and serve her in the same capacity he had served Clara Barton for so many years"; and, further, that in the fall of 1916 she told him in a conversation, on their way to Rockville, that "she had not paid Dr. Hubbell anything for the property." She repeated to Leslie Leland Barton that Dr. Hubbell had conveyed all the property to her without consideration, and she asserted to Mrs. Wilmer B. Wood, an intimate friend, that the property "had not cost her a cent. It had been transferred to her by Dr. Hubbell for a memorial for Clara Barton"; and, on another occasion, she said "Dr. Hubbell is an old goose, anyway," she says, "I got all this property for nothing," and in a third conversation, she repeated the last statement. It was satisfactorily established that both before and after the execution of the deeds and the delivery of the property, Mrs. Hirons had assured the appellee that Miss Barton's career and work were her ideals, and that she had dedicated her life and her fortune to the completion of a magnificent memorial on the property which was conveyed to her by the appellee.

A will was made by Mrs. Hirons at Washington June 30th, 1914, directing that the sum of ten thousand dollars be expended in building a Rawson family mausoleum, and devising and bequeathing all her property of every kind for the purpose "of maintaining the Clara Barton Home, Glen Echo, Maryland, which I desire to be used as a memorial to her." On April 14th, 1925, she wrote to the Washington Railway and Electric Company in reference to its solicited donation of land, and assured the company that $100,000 had been contributed towards the erection of a Clara Barton memorial to be erected at Glen Echo, and another sum of $250,000 had been pledged for endowment purposes, and that the plans and drawings for the memorial had been prepared and were in the hands of the builders, and then this paragraph follows: "My personal contribution to the Clara Barton Memorial Association will be the Clara Barton home and cottages at Glen Echo, which I now own."

These and other declarations and statements, both oral and written, when taken in connection with all the testimony and circumstances appearing in the proof, lend credibility to the testimony of the appellee that the receipt given by him to the appellant, acknowledging that he had been paid ten thousand dollars for the land and bonds, was not given as of its purporting date of May 14th, 1914, but had been signed by him at a later period, when it was given at the instance of the appellant for use in a pending litigation. The *prima facie* meaning of an unsealed receipt is always open to explanation, and whatever difficulty its presentation might have raised here has been eliminated by the proof, when considered in connection with all the surrounding circumstances. If the simulated communications from Clara Barton had brought the appellee under the dominion of the appellant to the extent of surrendering to her practically all he possessed, by deed, it is not reasonable to infer he would have balked at a mere pre-dating and signing of a receipt which was needed to facilitate the ends of the appellant; nor could a false contempo-

raneous receipt outweigh the proof on this record, that no·
such consideration had ever been received by the appellee.

The belief of the appellee in spiritualism is not sufficient·
to establish incapacity to make a valid deed. *Brown v. Ward,*
53 Md. 376, 387. However, faith in the power of the spirit
of the dead to communicate with the living through the in-
strumentality of exceptional individuals, who are so pecu-
liarly endowed as to become, while in a trance, the medium,.
through which the communication is established, is one thing;.
but the betrayal of that faith by false messages being trans-
mitted to a believer by a genuine or spurious medium while·
in a simulated trance is quite another, and that a gross fraud..
It is neither the desire nor the office of this tribunal to com-
ment upon any belief, but the inherent nature of spiritualism
exposes its votaries to the dangers of deception through the·
inevitable confidence reposed in the medium, who so fre-·
quently is proved to be a charlatan or impostor actuated by
mercenary motives.

In the case now before us the appellant denies not only·
that she is a spiritualist, but also that she ever was in a.
trance or, while in that apparent state, delivered any mes-
sage from the spirit of Clara Barton; but, despite this denial,.
the proof has convinced the court that, although not a believer·
in spiritualism, she pretended that she was the medium for
the spirit of Clara Barton, and that, while the appellee was·
under the influence of this deception and of his own faith,
she designedly and for her own selfish benefit fabricated
false messages and uttered them as genuine communications
from the spirit of Clara Barton. It was by these imaginary
conversations with the dead that the appellant adroitly and·
corruptly induced the appellee to part with his property. His·
credulity would be incredible, if there were not instances of
many similar frauds. But the appellant is in no position.
to argue the improbability of the deception for which she is
responsible, because there is indisputable record evidence of
her later utilization of this same faith to induce him to·re-
turn to Glen Echo. We refer to the occasion when the appel-

lant composed two telegrams and sent them herself to the
appellee as purporting to come from a medium well known
to the appellee. The messages were practically identical and
one read thus: "The battery above your head of spirit
friends is broken. Get back to G. E. as soon as possible.
Don't waste a minute. Mrs. W."

If the appellee was susceptible to a recall to Glen Echo
by such a flimsy humbuggery, how powerful and constraining
upon his will and how he must have been swayed and domi-
nated by what to him was the actual command of his revered
and dead patroness urging him, through argument and covert
threat of personal misfortune if disobedient, to give to the ap-
pellant what Clara Barton had herself bestowed, in order that
his own contemplated memorial plan might be certainly and
magnificently fulfilled through the union of what he had re-
ceived with not only the wealth of the appellant, but also the
wealth which Clara Barton promised would respond to her
request. On the facts of this record, we have no doubt
that the transfer of the property from the appellee was with-
out consideration, and was procured by a fraud whose nature
placed the will of the donor under the domination and control
of the appellant by reason of her pretended messages from
Clara Barton, and that the gift of the property in question
was through the coercion of this improper and undue influ-
ence. The subsequent conduct of the beneficiary of this
fraud was skillfully made to appear consistent with the ob-
ject of the donor in his gift. There is no question of laches
where the actual situation has been concealed by the artifice
of the party claiming the benefit of that rule, and the in-
jured party has acted promptly on his discovery of the actual
facts. Under the authorities the appellee was entitled to the
relief granted below, which provided for an accounting be-
tween the parties because of repairs and sales made, and rents
collected, and liens created and discharged, in whole or in
part, and other items of charges and allowances.

*Lyon v. Home,* L. R. 6 Eq. 655, 682; *Stouffer v. Wolfkill,*
114 Md. 603, 612; *O'Dell v. Goff,* 149 Mich. 152, 10 L. R. A.

(N. S.), 989; *Steinkuehler v. Wempner,* 169 Ind. 154, 15 L.
R. A. (N. S.), 673; *Middleditch v. Williams,* 45 N. J. Eq.
726, 4 L. R. A. 738; *Orchardson v. Cofield,* 171 Ill. 14, 40·
L. R. A. 256; *Beach v. Beach* (N. Y.), 23 App. Div. 411;
*Jasinski v. Stankowski,* 145 Md. 58; *Springer v. Springer,*
144 Md. 465; *Clark v. Clark,* 139 Md. 42; *Suman v. Harvey,*
114 Md. 256; *Ruhe v. Ruhe,* 113 Md. 601.

The exceptions to the testimony were not pressed on ap-
peal, and they afford no ground for reversal.

> *Decree affirmed, with costs to the appellee,*
> *and cause remanded for further pro-*
> *ceedings in conformity with the decree·*
> *of the court below.*