KAYLOR *v.* WILSON ET AL.

[No. 192, September Term, 1970.]

*Decided February 8, 1971.*

708

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*James P. Salmon,* with whom were *James R. Bucher* and *Sasscer, Clagett, Powers & Channing* on the brief, for appellant.

*Allen S. Handen,* with whom were *Handen & Singerman* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court.

Article 81, § 99A of the Maryland Code (1957, 1969 Repl. Vol.) provides:

> "When any tax sale made prior to January 1, 1944, has been finally ratified, then no court of equity or law in this State shall on and after June 1, 1966, entertain any proceedings to set aside or modify any title to any interest obtained in such sale."

This appeal flows from a proceeding instituted in 1967 to challenge a 1938 tax sale. The appellees, Parran Wilson and the other heirs or devisees of James W. Wilson, filed an action in trespass *quare clausum fregit* against Harry W. Kaylor, the appellant. This represented an attempt to set aside any title Kaylor may have obtained in a 13.7 acre tract of land located on the Patuxent River near Dunkirk in Calvert County. Kaylor acquired the land through a tax sale which was finally ratified by the Circuit Court for Calvert County in 1938. That same court, now sitting in 1970 (Loveless, J.), ruled that in spite of the broad bar contained in Art. 81, § 99A against challenges to ancient tax sales, an attack based on fraud or lack of jurisdiction was still permissible. Judge Loveless ultimately determined that because no taxes were overdue on the property at the time it was sold, the county treasurer was without power to conduct the sale and the circuit court lacked subject matter jurisdiction to ratify it. He then entered judgment against Kaylor for nominal damages and costs. This appeal followed. To gain some perspective over the dispute, we must unravel a double helix of conflicting chains of title.

The initial chain of title began when Mr. James W. Wilson purchased 50 acres of land, including the 13.7 acres in question, through a 1916 tax sale. Although the deed executed at the time of this sale was not recorded until January 1930, the entire 50 acres, instead of being assessed separately, were carried on the books in combination with another 25 acres owned by the Wilsons as a single 75 acre tract. Allowing for a sale of 2 acres by 1949, the appellees attempted to prove that they paid taxes on the entire 75-73 acres from 1916 to the date of trial.

The other chain of title began when Kaylor entered this relatively uncomplicated picture in March 1930, some two months after the recordation of the deed to Wilson's 50 acre tract. He first appeared as president of the Silica Tile Company, when it contracted to purchase 20 of the 50 acres. This contract was recorded and the 20 acres

were transferred on the county land and assessment records to Silica's name. Appellant suggested this was done to insure that Silica would receive the tax bills and pay the taxes as provided in the contract. Nearly a year later, on February 4, 1931, Silica contracted to sell 6.3 acres of the 20 to Kaylor personally. On the next day James Wilson and his wife similarly agreed to convey their remaining interest in the same 6.3 acres to Kaylor. Following the death of the elder Wilson in 1932, the family honored this contract and the 6.3 acres were finally transferred to Kaylor in 1937. It was the remaining 13.7 acres of the 20 that fomented the present controversy.

Silica went bankrupt in May of 1931 and Kaylor (for his third appearance) was appointed one of the receivers of the company's assets. Among these assets was Silica's interest in the 20 acres, subject to Kaylor's right to acquire the 6.3 acres under the February 4th and 5th, 1931 contracts. With court approval the receivers sold the corporation's interest to Charles E. Henson, then one of Kaylor's employees. Henson immediately deeded his interest to Mr. and Mrs. Kaylor, but this did not complete the circle: In 1933 the Kaylors conveyed their interest to Benjamin H. Grubb, yet another Kaylor employee, who apparently resided on the property. Keeping in mind that the 20 acre tract had been listed in 1931 on the assessment records in Silica's name, but without reduction in the number of acres assessed to Wilson, it turned out that neither Grubb nor his predecessors (Silica, Henson, or Kaylor) paid any taxes under their equitable chain of title from 1931 to 1934. Although the land was sold at a tax sale, the Wilsons now claim they had paid their taxes on the property for those years. The coup de grace came in 1938 when Kaylor (his last appearance until trial) acquired the property through the tax sale. The resulting treasurer's deed contained a full metes and bounds description of the entire 20 acres, even though Kaylor had already obtained legal title to the undisputed 6.3 acres in 1937 directly from the Wilson family.

Judge Loveless found that Kaylor had not produced suf-

ficient evidence of exclusive possession to acquire title by prescription. *Cf. Goen v. Sansbury,* 219 Md. 289, 149 A. 2d 17 (1959). He also determined as a matter of fact that the property had been doubly assessed for taxes since 1931, and though there had been a default in this regard under the Silica-Kaylor chain of title, the Wilsons had continuously paid the taxes on the property from 1916 to the present.

The appellant contends that Art. 81, § 99A was a complete bar to this action, regardless of the fact that the tax sale might have been tainted by fraud or lack of jurisdiction. He then suggests that even if we assume such a collateral attack on an enrolled decretal order was permissible, the plaintiff failed to introduce sufficient evidence to establish either fraud or lack of jurisdiction. We shall follow this suggestion in part.

We say in part, because an attack on an enrolled decree or decretal order based on fraud can only be maintained through a direct attack in the same proceedings under Maryland Rule 625 or through an original bill for fraud. *Hohensee v. Minear,* 259 Md. 603, 270 A. 2d 776 (1970), *Grantham v. Prince George's County,* 251 Md. 28, 34, 246 A. 2d 548 (1968) and cases cited in both of those opinions. The plaintiff in this case has utilized the common law action of trespass q.c.f., an inappropriate method to collaterally challenge an enrolled decree voidable for fraud. In any event Judge Loveless did not render his decision on that ground. He chose rather to base his decision on the Wilsons' only other contention: the sale was void for lack of jurisdiction because the taxes were not in default. See *Bugg v. State Roads Comm'n,* 250 Md. 459, 461, 243 A. 2d 511 (1968); *Jannenga v. Johnson,* 243 Md. 1, 8, 220 A. 2d 89 (1966) (Horney, J. concurring); *Mullen v. Brydon,* 117 Md. 554, 559, 83 A. 1025 (1912); *Thomas v. Hardisty,* 217 Md. 523, 535, 143 A. 2d 618 (1958). It is unnecessary for us to decide, however, if this line of inquiry was permissible under § 99A, for we find merit in the appellant's contention that the Wilsons did not meet the burden of proof necessary to

show that the tax sale was void for lack of jurisdiction over the subject matter. In short, they did not prove the taxes were paid.

Had this action been brought under Art. 81, § 113 of the Code (1957, 1969 Repl. Vol.) we would have no problem with the line of attack utilized by the appellees, for as we stated in *Thomas v. Kolker,* 195 Md. 470, 475, 73 A. 2d 886 (1950) "the legislature has declared that the public interest in marketable titles to property purchased at tax sales outweighs considerations of individual hardship in every case, except upon a showing of lack of jurisdiction or fraud in the conduct of the foreclosure." The difficulty is that whereas § 113 specifically permits challenges to post-1944 tax sale decrees based on actual fraud or lack of jurisdiction, § 99A, which was designed to stabilize to the furthest possible degree title to land under pre-1944 tax sales, does not contain such an explicit proviso.[1] In *Styers v. Dickey,* 252 Md. 552, 556 and 558, 250 A. 2d 615 (1969) we upheld the extensive bar contained in § 99A and suggested that it was facially constitutional, citing *Allen v. Dovell,* 193 Md. 359, 66 A. 2d 795 (1949) as a basis for this proposition. Moreover, as appellant points out, § 99A uses the strongest possible language to bar the courts of this state from taking jurisdiction of a challenge to an ancient tax sale. His reference to *McMahan v. Dorchester Fert. Co.,* 184 Md. 155, 160, 40 A. 2d 313 (1944) ; *Saranac Land and Timber Co. v. Roberts,* 177 U. S. 318 (1900) and *Dickinson v. Hardie,* 79 Ark. 364, 96 S. W. 355 (1906) are food for thought, for those cases urge us not to engraft implied exceptions on statutes of repose which are designed to run against all tax sales, whether they be regular, voidable, or void for jurisdictional defects. But we need not explore this area for we think the Wilsons failed to overcome the

1. In any challenge to a tax sale one must distinguish between a pre-1944 ratification of a tax sale under the Acts of 1872, ch. 384, and its successor statutes, and a decree foreclosing a right of redemption following a tax sale as authorized by the Acts of 1943, ch. 761, Art. 81, § 97 et seq. It is, of course, possible to obtain a foreclosure decree to a tax sale that was carried out and even ratified prior to 1944. Art. 81, §§ 98 and 99.

strong presumption that the tax sale was regular and Kaylor's title under it was good.

It is well settled that an order of ratification is prima facie evidence of the regularity of a tax sale and that the burden of showing its illegality rests on the challenger. *Gill v. Sommer*, 191 Md. 204, 210, 60 A. 2d 683 (1948); *Hickey v. Peck*, 180 Md. 289, 298-99, 23 A. 2d 711 (1942); *Free v. Greene*, 175 Md. 36, 42, 199 A. 857 (1938); *McMahon v. Crean*, 109 Md. 652, 666-67, 71 A. 995 (1909), and *Baumgardner v. Fowler*, 82 Md. 631, 34 A. 537 (1896), quoting from *Marx v. Hanthorn*, 148 U. S. 172 (1893). Moreover, an attack on an enrolled decree or decretal order for lack of jurisdiction or fraud requires clear and convincing proof. *Master v. Master*, 223 Md. 618, 624-25, 166 A. 2d 251 (1960); *Boring v. Jungers*, 222 Md. 458, 160 A. 2d 780 (1960); *cf. Household Fin. Corp. v. Taylor*, 254 Md. 349, 355, 254 A. 2d 687 (1969). When the legislature has given an order of ratification the degree of permanence expressed in § 99A we think that the strictest proof is necessary to impeach it, assuming impeachment is permissible. The quantum of proof this requires is as great if not greater than that needed to overcome the presumptive validity of a sheriff's return as proof of service of process. We have repeatedly held a mere denial even accompanied by inconclusive corroborating testimony is insufficient for that purpose. *Little v. Miller*, 220 Md. 309, 316, 153 A. 2d 271 (1959); *Weisman v. Davitz*, 174 Md. 447, 451, 199 A. 476 (1938); *Master v. Master, supra.* In this case the operative fact giving rise to jurisdiction over the subject matter was the county treasurer's ministerial decision that taxes were in default on the property during the four years in question. As was noted in *Parker v. Berryman*, 174 Md. 356, 359, 198 A. 708 (1938), another case involving a challenge to personal jurisdiction based upon an official return of service of process, " 'Intendments will be made in support of the acts of ministerial officers, where they appear by the return of process to have discharged their duty, and the *onus probandi* rests on the party impeaching such

acts.' " quoting from *Windwart v. Allen,* 13 Md. 196, 200 (1859). Here, the Wilsons not only failed to provide the strict proof required to mitigate the drastic effect of the jurisdictional bar in § 99A of Art. 81 (assuming such an attack is permissible), but they completely failed to introduce any evidence, other than vague assertions, capable of controverting the treasurer's decision that taxes had not been paid on the property from 1931 to 1934.

The initial problem facing the appellees came through their choice of trespass q.c.f. as a vehicle for challenging the tax sale, since that common law form of action requires the plaintiff to rely on the strength of his own title and not the weakness of his adversary's. *Stottlemyer v. Kline,* 255 Md. 635, 259 A. 2d 52 (1969); *Spicer v. Gore,* 219 Md. 469, 473, 150 A. 2d 226 (1959). Curiously enough, the documentary proof needed to establish even a paper chain of title to the property was absent. The Wilsons chose, notably without objection by Kaylor, to rely only on the rough notes and abstracts of a title examiner for this purpose.

A similar absence of formal proof accompanied the Wilsons' attempt to show that taxes on the property had not been in default from 1931 to 1934, the basic jurisdictional inquiry on their theory of the case. We have microscopically examined the record before us for the evidence necessary to sustain Judge Loveless' finding in this regard, but to no avail. Focusing in on documentary proof, the Wilsons did not rely on the treasurer's records but only chose instead to introduce paid tax bills for the years 1926 and 1969, when it is apparent that had they introduced every tax receipt from 1916 to 1970, with the exception of 1931, '32, '33 or '34, they still would not have proved their point. The only testimony from the parties themselves which sheds any light on the question came from one of James Wilson's grandsons, Parran Ford, who was only eight years old in 1931:

> "Q. Who paid the taxes all these years? A. We have. James R. Wilson estate.
>
> . . . .

> Q. Mr. Ford, where is the balance of the 50 acres that you obtained—that your grandfather obtained? A. Balance of the 50 acres? That's what we're working on now. Six of the 50 acres —Mr. Kaylor's six and three-quarter tenths— they gave him a deed for that. The rest of it still remains with the Wilsons. We have been paying taxes on it."

Though unrefuted, neither of these passing references are precise or authoritative enough to qualify as even slight proof that taxes were paid during the critical years in the early 'thirties.

Finally, the only attempt to bring official testimony to bear on the question came from the supervisor of assessments for Calvert County and he failed to discuss the payment of taxes prior to 1949. He testified that from his check of the county records, the Wilsons had been assessed for 75 acres of land, but that as of 1949 only 73 acres were carried on the assessment books. At this point the critical question was asked:

> "Q. . . . And to the best of your knowledge taxes have been paid on this acreage, namely 73 acres? A. I would say since 1949."

Beyond these exiguities the record is silent on the question of taxes. In view of the strict burden of proof required in an attempt to upset the court's jurisdiction over an ancient tax sale, we must conclude that Judge Loveless was clearly in error in finding that any taxes had been paid on the property from 1931 to 1934.

> *Judgment reversed and judgment entered for the appellant. Costs to be paid by the appellees.*