## BOWIE ET AL. *v.* FORD ET AL.

[No. 238, September Term, 1972.]

*Decided May 18, 1973.*

112

The cause was argued before MURPHY, C. J., and McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

114

*James P. Salmon,* with whom were *Sasscer, Clagett, Channing & Bucher* on the brief, for appellants.

*Allen S. Handen,* with whom were *Handen & Singerman* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court.

This case is a sequel to *Kaylor v. Wilson,* 260 Md. 707, 273 A. 2d 185 (1971). There, this Court decided that an enrolled decretal order dated May 4, 1938 which finally ratified a tax sale could not be collaterally attacked for fraud in a trespass *quare clausum fregit* action. A substantial portion of the material facts here are matters of record and are undisputed. In fact, by stipulation, the parties agree that our opinion in *Wilson, supra,* 260 Md. at 709, accurately recites the history and the findings of fact by the trial judge in the previous law suit and correctly traces the chain of title of the property as developed at the trial of this case. With this stipulation, we will set forth the facts here as we did in the prior case: "[That] appeal flowed from a proceeding instituted in 1967 to challenge a 1938 tax sale. The appellees, Parran Wilson and the other heirs or devisees of James W. Wilson, filed an action in trespass *quare clausum fregit* against Harry W. Kaylor, the appellant. This represented an attempt to set aside any title Kaylor may have obtained in a 13.7 acre tract of land located on the Patuxent River near Dunkirk in Calvert County. Kaylor acquired the land through a tax sale which was finally ratified by the Circuit Court for Calvert County in 1938. That same court, [then] sitting in 1970 (Loveless, J.), ruled that in spite of the broad bar contained in Art. 81, § 99A against challenges to ancient tax sales, an attack based on fraud or lack of jurisdiction was still permissible. Judge Loveless ultimately determined that because no taxes were overdue on the property at the time it was sold, the county treasurer was without power to conduct the sale and the circuit court lacked subject matter jurisdiction to ratify it. He then entered judgment against Kaylor for nominal damages and costs. This appeal followed. To gain some perspective over the dispute, we must unravel a double helix of conflicting chains of title.

The initial chain of title began when Mr. James W. Wilson purchased 50 acres of land, including the 13.7 acres in question, through a 1916 tax sale. Although the deed executed at the time of this sale was not recorded until January 1930, the entire 50 acres, instead of being assessed separately, were carried on the books in combination with another 25 acres owned by the Wilsons as a single 75 acre tract. Allowing for a sale of 2 acres by 1949, the appellees attempted to prove that they paid taxes on the entire 75-73 acres from 1916 to the date of trial.

The other chain of title began when Kaylor entered this relatively uncomplicated picture in March 1930, some two months after the recordation of the deed to Wilson's 50 acre tract. He first appeared as president of the Silica Tile Company, when it contracted to purchase 20 of the 50 acres. This contract was recorded and the 20 acres were transferred on the county land and assessment records to Silica's name. Appellant suggested this was done to insure that Silica would receive the tax bills and pay the taxes as provided in the contract. Nearly a year later, on February 4, 1931, Silica contracted to sell 6.3 acres of the 20 to Kaylor personally. On the next day James Wilson and his wife similarly agreed to convey their remaining interest in the same 6.3 acres to Kaylor. Following the death of the elder Wilson in 1932, the family honored this contract and the 6.3 acres were finally transferred to Kaylor in 1937. It was the remaining 13.7 acres of the 20 that fomented the present controversy.

Silica went bankrupt in May of 1931 and Kaylor (for his third appearance) was appointed one of the receivers of the company's assets. Among these assets was Silica's interest in the 20 acres, subject to Kaylor's right to acquire the 6.3 acres under the February 4th and 5th, 1931 contracts. With court approval the receivers sold the corporation's interest to Charles E. Henson, then one of Kaylor's employees. Henson immediately deeded his interest to Mr. and Mrs. Kaylor, but this did not complete the circle: In 1933 the Kaylors conveyed their interest to Benjamin H. Grubb, yet another Kaylor employee, who apparently resided on the property. Keeping in mind that the 20 acre tract had been listed in 1931 on the

assessment records in Silica's name, but without reduction in the number of acres assessed to Wilson, it turned out that neither Grubb nor his predecessors (Silica, Henson, or Kaylor) paid any taxes under their equitable chain of title from 1931 to 1934. Although the land was sold at a tax sale, the Wilsons now claim they had paid their taxes on the property for those years. The coup de grace came in 1938 when Kaylor (his last appearance until trial) acquired the property through the tax sale. The resulting treasurer's deed contained a full metes and bounds description of the entire 20 acres, even though Kaylor had already obtained legal title to the undisputed 6.3 acres in 1937 directly from the Wilson family.

Judge Loveless found that Kaylor had not produced sufficient evidence of exclusive possession to acquire title by prescription. He also determined as a matter of fact that the property had been doubly assessed for taxes since 1931, and though there had been a default in this regard under the Silica-Kaylor chain of title, the Wilsons had continuously paid the taxes on the property from 1916 to the present." However, in *Wilson* we reversed the judgment of the trial court observing that an attack based on fraud, if it is permitted at all, "can only be maintained through a direct attack in the same proceedings under Maryland Rule 625 or through an original bill for fraud."

Seizing upon this suggestion, within thirty days of this Court's mandate, Parran Ford, together with three other of the appellees in Wilson,[1] who are also the appellees here, filed a motion under Rule 625 in the original tax sale proceeding in the Circuit Court for Calvert County (Petition No. 909). By this motion they sought to strike and vacate the order of ratification as it pertained to the 13.7 acre tract. The motion alleges that this decretal order of ratification should be set aside because the purchaser at the tax sale, Harry W. Kaylor, the appellant in *Wilson,* obtained its passage by means of fraud. After the filing of an answer in these proceedings, but before the matter was heard by the trial

---

1. Parran Wilson and some of the other heirs of James W. Wilson, though parties to the first suit, did not join in pursuing this case.

court, Mr. Kaylor died and Helen Bowie, Laura B. Cox, and Jeannette Byler, individually as devisees under the will of Harry W. Kaylor and as personal representatives of his estate, were substituted as parties. These appellants contend here, as they did in the trial court, that because of the provisions of Maryland Code (1957, 1969 Repl. Vol.) Art. 81, § 99A, a court of this state is without jurisdiction to entertain such a proceeding and the petition should have been dismissed.[2] Section 99A reads:

> "When any tax sale made prior to January 1, 1944, has been finally ratified, then no court of equity or law in this State shall on and after June 1, 1966, entertain any proceedings to set aside or modify any title to any interest obtained in such sale."

This contention was initially pressed at the trial level by a demurrer to the motion. Judge James H. Taylor overruled that challenge and later, following a full hearing, he concluded that the entire tax sale proceeding, including its ratification, so far as it pertained to the 13.7 acre tract, was procured by the fraudulent acts of Harry W. Kaylor. Accordingly, after deciding that § 99A did not bar an attack on this pre-1944 tax sale since the court was satisfied by clear and convincing proof that the ratification of the tax sale was procured by fraud, Judge Taylor set aside the ratification. We cannot accept this interpretation as to the effect of § 99A on ancient tax sales. In fact, a contrary result is compelled by our recent decision in *Styers v. Dickey*, 252 Md. 552, 250 A. 2d 615 (1969). There, Judge Smith, speaking for the Court, after referring to the Legislature's recognition of the public interest in upholding the validity of ancient tax sales to insure the marketability of title to land derived through them, stated: "The plain and simple meaning of

---

2. A similar defense was made when this dispute was before us in Kaylor v. Wilson, 260 Md. 707, 273 A. 2d 185 (1971) but there we found it unnecessary to determine whether § 99A constituted a bar. However, we noted that, in any challenge to a tax sale one must distinguish between a pre-1944 ratification of such a sale under the Acts of 1872, Chap. 384, and its successor statutes, and a decree foreclosing a right of redemption following a tax sale as authorized by the Acts of 1943, Chap 761, codified as Art. 81, § 97 et seq. Kaylor v. Wilson, *supra*, 260 Md. at 712.

section 99A is that since June 1, 1966, with reference to any tax sale made prior to January 1, 1944, which sale was finally ratified, the courts of this state are *without jurisdiction* 'to set aside or modify any title to any interest obtained in such sale.' " *Id.* at 558 (emphasis added). Here we will not retreat from that statement nor will we, as did the trial judge, engraft implied exceptions on this statute of repose which was fashioned by the Legislature in order to insure the integrity of ancient tax sale proceedings.

But, accepting as we must the mandate of § 99A that the courts are without jurisdiction "to set aside or modify *any title to any interest obtained in such sale*" (emphasis added), this does not dispose of this appeal. Remaining for our consideration is a determination of what interest in the 13.7 acres Harry W. Kaylor obtained through the ratified tax sale. This is necessary because, if the chancellor's finding is authorized by the evidence that there was clear and convincing proof [3] that the sale, as ratified, was procured by fraud perpetrated by Kaylor, the purchaser, then the interest he obtained from the sale would be that of a constructive trustee or trustee *ex maleficio*, holding bare legal title, but with the equitable title remaining in the Wilson heirs as the *cestui que* trust.[4] The law of this state is well settled that:

> "Constructive trusts ... are raised by equity in respect of property which has been acquired by fraud .... They arise purely by construction of equity, independently of any actual or presumed intention of the parties to create a trust, and are generally thrust on the trustees for the purpose of working out the remedy. The trusts are not what are known as technical trusts, and the ground of relief in such cases is, strictly speaking, fraud and

---

**3.** This is the quantum of proof required to establish fraud in a case such as this. Peninsula Meth. Homes v. Cropper, 256 Md. 728, 737, 261 A. 2d 787 (1970).

**4.** While the Statute of Frauds requires a writing to create an express trust in real property, it has no application to cases where the law raises a constructive trust by reason of fraudulent acts in procuring title to land. Constructive trusts are held not within the statute because they rest on the doctrine of estoppel. Leupold v. Leupold, 156 Md. 516, 519, 144 A. 647 (1929).

not trust. Equity declares the trust in order that it may lay its hand on the thing and wrest it from the possession of the wrongdoer." *Eisinger Mill Etc. Co. v. Dillon,* 159 Md. 185, 191, 150 A. 267 (1930).

*See Wooddy v. Wooddy,* 258 Md. 224, 232-33, 265 A. 2d 467 (1970); *Siemiesz v. Amend,* 237 Md. 438, 441-42, 206 A. 2d 723 (1965); *O'Connor v. Estevez,* 182 Md. 541, 555, 35 A. 2d 148 (1943); *Restatement of Restitution,* 640-41, § 160 (1937). Such trusts are "fraud rectifying" trusts and not "intent enforcing" ones.[5] Therefore, a transferee who obtains title to property through his own dishonesty or that of another acting for him cannot maintain that title against the party wronged. This is true whether the transfer was brought about by a deed, will or court decree. In such a situation, courts of equity have the power, and indeed the duty, to reach out and grab the property for the benefit of those wronged unless a purchaser for value "in good faith and without notice acquires a higher right and takes the property relieved from the trust" imposed on the original wrongdoer or a subsequent holder. 4 Pomeroy, *Equity Jurisprudence,* 120, § 1053 (Symons ed. 1941). Here no bona fide purchaser with either a legal or equitable claim has intervened because those who now resist the appellees' efforts to establish their ownership of the property take under and by virtue of Kaylor's will and stand in his shoes. *McInnes v. McInnes,* 163 Md. 303, 312-13, 163 A. 85 (1932). However, in this type of case, were there a bona fide purchaser, he would be protected since the bare legal title the constructive trustee has is sufficient to pass good title to a good faith purchaser for value. *Cf. Matthews v. Fuller,* 209 Md. 42, 120 A. 2d 356 (1956); *McInnes v. McInnes, supra; Houston v. Wilcox,* 121 Md. 91, 88 A. 32 (1913). *See also* Code (1957, 1971 Repl. Vol.), Art. 39B, §§ 9-10 (relative rights of creditors and bona fide purchasers under the Uniform Fraudulent Conveyance Act).

Keeping this concept of constructive trusts in mind, we now turn to a determination of whether there was sufficient

---

**5.** Costigan, *The Classification of Trusts as Express, Resulting, and Constructive,* 27 Harv. L. Rev. 437 (1914).

evidence before the chancellor, which meets the test of being clear and convincing, from which he could have concluded, as he did, that Kaylor obtained title to the 13.7 acres of land by fraud. We conclude that there was. In addition to finding the undisputed facts already related, the chancellor further concluded, and there is evidence to support these findings, that, under the terms of Silica's purchase agreement with the Wilsons, the contract purchaser was not only to pay all of the taxes properly levied but also to pay the agreed purchase price in installments. However, neither the contract price nor the taxes from the years 1931 through 1934, the crucial years in this case, were paid by Kaylor, his corporation, or anyone on their behalf. In the meanwhile, because of the double assessment on the property, the Wilsons had been paying the taxes. At the trial in this case, Wilson's heirs produced receipts for the years from 1931 through 1940, with the exception of 1932, from the county treasurer showing payment of taxes. However, the collector of taxes testified that it was their practice not to accept the payment of the current year's taxes unless all prior taxes were paid. Thus, Judge Taylor concluded that the taxes were paid on the property by the Wilsons throughout the period of this controversy.

The chancellor was also satisfied that the events leading up to the tax sale and Kaylor's wresting title from the Wilsons through that sale were all a part of a fraudulent scheme devised by Kaylor and his corporation, with the cooperation of his employees, to obtain as much as they could for the least amount possible. In Judge Taylor's words, although we have done some slight editing, the proof of this fraudulent scheme is demonstrated by the fact that:

> "these dealings between Silica [the corporation] which had become insolvent and Kaylor and Kaylor and Grubb and Kaylor and/or Grubb and Henson [Kaylor's employees] were all a part of a scheme designed to allow the property to go up for tax sale.
>
> It seems clear and it is quite understandable that as one of the principal officers of the corporation

Mr. Kaylor would try to salvage as much of the assets of the corporation as he could and it so happened that he did get the contract — excuse me, an assignment of the contract of Wilsons to Silica, assigned to himself. All of the inplay involving this **property was restricted to the individuals who were so co-mingled either by way of officership in the corporation or by relationship to the** employer-employee or tenants on the property that, particularly in light of the statement by Mr. Kaylor that one of his grantees just didn't have a thing and was a roustabout, so to speak, I am satisfied that the purpose of putting these deeds into these different persons was for the sole purpose of breaking a direct chain from the Wilsons or Silica to Mr. Kaylor. I believe that as you look at it as it transpired over the years that neither of those employees was a disinterested party or a [bona fide] purchaser.

Now had Mr. Kaylor and his assignees abided by the requirements of the contract to pay the taxes when due there would have been no occasion whatsoever for this land to have gone to tax sale. They did not do it and it was not done for the sole reason that Kaylor desired to obtain clear title of the land through a tax sale without having to pay the balance of the purchase price."

Since there was sufficient evidence to support the chancellor's findings we cannot say that he was clearly in error in determining that the tax sale proceeding was brought about by the fraud and chicanery of Kaylor. Rule 886.

In view of this finding, we conclude that the interest Kaylor obtained from the tax sale proceeding was that of a constructive trustee, with the equitable estate, which in equity is regarded as the real ownership, being in the Wilson heirs. In reaching this conclusion we are not unmindful of the fact that these present proceedings originated with a motion under Rule 625 to set aside an enrolled decretal order

of ratification. But, the law of this state is well settled that if the specifically requested remedy cannot be granted, relief suitable to the nature of the case is authorized under the prayer for general relief, which was included here. *Harris v. Harris,* 213 Md. 592, 597, 132 A. 2d 597 (1957); *Phillips Co. v. Md. Broadcasting Co.,* 184 Md. 187, 197-98, 40 A. 2d 298 (1944); *McKeever v. Realty Co.,* 183 Md. 216, 224, 37 A. 2d 305 (1944); Miller, *Equity Procedure,* 128-29, § 100 (1897).

Under the view we have taken of this appeal, only one more contention raised by appellants in an attempt to obtain a reversal needs discussion. They claim that, regardless of what theory is advanced in this case, the Wilson heirs failed to act with due diligence in instituting this suit. Generally speaking laches is an equitable doctrine and its application is dependent upon' the facts and circumstances of each case. Its intended purpose is to enable the chancellor to do justice and it should never be used except in pursuit of that goal. *Brashears v. Collison,* 207 Md. 339, 352, 115 A. 2d 289 (1955). True, here, the tax sale was ratified in 1938 and almost thirty years passed before the appellees attacked it by legal action. But, the reason for this long delay, as explained by the appellees and accepted by the chancellor, stemmed from the fact that they only became aware that Kaylor was claiming title to their property in 1967, when he began dredging operations on the land. Upon observing this activity, the Wilson heirs reacted promptly, and within a few months they instituted their initial action (trespass *q.c.f.*) to contest Kaylor's claim of title. When that action failed on technical grounds, these appellees, in a matter of days, renewed their claim through this proceeding. Twenty-nine years is a very long period but it is clear that "no lapse of time, nor delay in bringing a suit, will defeat the remedy, provided the injured parties were, during all this interval, [actually] ignorant of the fraud" or of any facts which reasonably should have put them on notice of its existence. *Farmer v. O'Carroll,* 162 Md. 431, 446, 160 A. 12 (1932); *Hirons v. Hubbell,* 149 Md. 593, 607, 132 A. 645 (1926). Judge Barnes in *Hall v. Barlow Corporation,* 255 Md. 28, 42, 255 A. 2d 873 (1969), in considering whether laches was a bar to a suit, put it this way for the Court: "generally the statute

applicable to actions at law will be followed by analogy by the equity courts . . . . [And], when periods of time less than the analogous period of the statute of limitations are involved, the equity courts will not sustain the defense of laches unless it appears that the defendant has been prejudiced by the plaintiff's delay in the assertion of his rights." In the present case it must be kept in mind that the chancellor, at least by inference determined that Kaylor did not attempt to occupy the 13.7 acres until 1967 and this was the first time appellees had any knowledge of his adverse claim. Therefore, this is the time when any analogous statute of limitations would begin to run. In determining what the analogous statute would be when a trustee *ex maleficio*, having bare legal title, attempts to assert title in himself, free of the trust, we hold that the applicable period is that similar to the one in an action in ejectment, namely twenty years. "And it has been deliberately held by this Court, that a court of equity in applying the Statute of Limitations analogically, as to the right of entry, will not permit the claim of a party to be affected by any devolution of time short of that which would have barred him at law in an action of ejectment." *Brashears v. Collison, supra* at 352; *McInnes v. McInnes, supra.* This suit was instituted well within that period.

As a last straw appellants next suggest, citing *Akin v. Evans, Exec.*, 221 Md. 125, 132, 156 A. 2d 219 (1959), that since their defense has been prejudiced by the lapse of time, a period shorter than that of the analogous statute of limitations is applicable. They follow this by asserting that Mr. Kaylor's death, prior to the hearing in this case, deprived them of the testimony of "the one person who would have had personal knowledge as to the circumstances surrounding the tax sale." We do not agree. A considerable portion of the evidence relied on by the chancellor to establish fraud was undisputed as it was obtained from the tax sale proceedings, the land records in Calvert County, or covered by the stipulation of the parties. Additionally, both the appellants and the chancellor had the benefit and use of Mr. Kaylor's testimony concerning the same subject matter

in the previous trespass case. In rejecting this contention, we agree with appellees when they state, "Appellants had the benefit of everything Mr. Kaylor knew about this case, or chose to recollect in the testimony given in [the prior case]." And, we note that mere lapse of time plus death are alone insufficient to establish prejudice. *McInnes v. McInnes, supra,* 163 Md. at 313.

In accord with the views herein expressed, we will vacate the order heretofore entered by the trial court and remand the proceedings for the fashioning of a decree by the chancellor determining that the appellants as devisees and personal representatives of Harry W. Kaylor hold title to the 13.7 acre tract of land as constructive trustees for the benefit of the Wilson heirs. And, since a court of equity, having once assumed jurisdiction, will retain it in order to administer complete relief, *(Hardisty v. Kay,* 268 Md. 202, 299 A. 2d 771 (1973), and further, since appellants have an equitable duty to convey, the decree should name a trustee to convey the property to those entitled under this opinion to receive it. *Fasman v. Pottashnick,* 188 Md. 105, 112, 51 A. 2d 664 (1947).

> *Order vacated and case remanded for the passage of a decree in accordance with the views herein expressed.*
> *Costs to be paid by the appellants.*