In re FIRST AMERICAN MORTGAGE CO., INC., Debtor.

Gordon ROSENBERGER, et al., Plaintiffs,

v.

FINANCIAL SERVICES GROUP, INC., et al., Defendants.

Bankruptcy No. 85–B–1987–JS.
Adv. No. 87–0185B.

United States Bankruptcy Court, D. Maryland.

June 23, 1992.

H. Alan Young, Young & Goldman, Alexandria, Va., for plaintiffs.

Michael McGettigan, Murphy, McGettigan & West, P.C., Alexandria, Va., for defendant Financial Services Group, Inc.

Michael D. Colglazier, David P. King, Hogan & Hartson, Baltimore, Md., for defendant MD. Nat. Bank (Successor to Equitable Bank, N.A.).

Richard W. Bryan, Jackson & Campbell, P.C., Washington, D.C., for defendant Francis X. Lambert.

## MEMORANDUM OPINION GRANTING DEFENDANT MARYLAND NATIONAL BANK'S MOTION FOR SUMMARY JUDGMENT

JAMES F. SCHNEIDER, Bankruptcy Judge.

### FINDINGS OF FACT

1. First American Mortgage Company, Inc. ["FAMCO"] filed a voluntary Chapter 11 bankruptcy petition in this Court on November 15, 1985 which was subsequently converted to Chapter 7.

2. The instant complaint was originally filed on April 9, 1987 in the Circuit Court of Fairfax County, Virginia by Gordon and Mary Rosenberger against the defendants, Financial Service Group, Inc., Francis X. Lambert, Joel Stillman and Equitable Bank, N.A. Maryland National Bank is the successor to Equitable Bank, N.A. Financial Services Group, Inc. [F.S.G.] is a Virginia corporation engaged in providing financial advice and the management of the financial affairs of its clients. Messrs. Lambert and Stillman were agents or employees of F.S.G. None of the parties is a debtor in this Court.

3. The complaint was removed to the U.S. Bankruptcy Court for the Eastern District of Virginia, Alexandria Division by an application filed by F.S.G. on May 5, 1987. F.S.G. then moved to transfer venue to the District of Maryland which was granted by consent order [P. 9] dated June 16, 1987, because of the pendency of the FAMCO bankruptcy in this Court.

4. The plaintiffs are investors who lost their investment of $80,000 in the purchase of two deed of trust notes from FAMCO. The investment was recommended by F.S.G. and the named individuals who were employees of F.S.G. The complaint alleges that the plaintiffs purchased the notes in April, 1984. F.S.G. allegedly promised to tender insured second deed of trust notes, copies of truth-in-lending statements, an amortization schedule and a certificate of insurance to the plaintiffs, in consideration for the payment of $80,000. Upon execution of the alleged contract, the Rosenbergers claim to have been entitled to an insured 16% of their investment per annum, in addition to the eventual return of their principal investment. They tendered $80,000 to F.S.G. but never received the notes, copies of the truth-in-lending statements, or an amortization schedule. Notwithstanding these breaches by F.S.G., the Rosenbergers *did* receive monthly interest payments of $1,174.99 from May, 1984 through November, 1985, and one additional payment on March 7, 1986. When the payments ceased, the Rosenbergers made demand for the notes from both F.S.G. and FAMCO, without success. The complaint states that "some or all of the notes originally purchased for Complainants" were assigned by FAMCO to Equitable Bank without the plaintiffs' knowledge or consent, and that Equitable Bank knew or should have known that the notes so assigned had been previously assigned to the plaintiffs.

5. The Bank acknowledged in its memorandum [P. 35] that it had been assigned the notes in question "as part of the collateral for working capital loans FAMCO received from Equitable in October and November, 1985." Id. However, the Bank, through the affidavit of its Vice President, James Henry, denied any knowledge that the notes had previously been assigned to the Rosenbergers. Mr. Henry further stated that before FAMCO's collapse, he was unaware "of the pervasive fraud being carried out by Michael Clott against Equitable and others." Exhibit A to Memorandum [P. 35].

6. The "pervasive fraud" mentioned above has been well documented in a number of reported decisions concerning FAMCO after it filed for bankruptcy. All of these opinions were written by then-Chief Judge Alexander Harvey II of the U.S. District Court for the District of Maryland[1]. In *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713 (D.Md.1989), a case brought by the debtor's bankruptcy trustee, Judge Harvey summarized the history of FAMCO's fraudulent dealings:

> FAMCO I, FAMCO II and their subsidiaries and affiliates were in the business of lending money and taking as security second and third mortgages on borrowers' residences. These were extremely high risk loans made to individuals with poor credit backgrounds. The debtors charged extremely high rates of interest in addition to substantial servicing fees. Equitable was banker for both FAMCO I and FAMCO II. Numerous bank accounts were maintained at Equitable by FAMCO I and FAMCO II and by subsidiaries and affiliates. Between 1983 and 1985, Equitable extended credit or otherwise loaned millions of dollars to FAMCO II for its operations. At various times during the debtor's existence, E.F. Hutton Mortgage Corporation (hereinafter "Hutton") was the principal entity which provided funds to the debtor to be lent to borrowers. At other times, Equitable was the primary source of these funds.

As the record here shows, there were at different times two corporations known as First American Mortgage Company, Inc. In 1979, Clott formed the first such corporate entity (referred to herein as "FAMCO I"), and he alone owned all of the outstanding stock of this corporation. In October of 1982, FAMCO I was renamed MH Mortgage Company, Inc. (hereinafter "MH Mortgage"). A new corporation bearing the same name, First American Mortgage Company, Inc. (referred to herein as "FAMCO II"), was then formed. Additional stockholders joined Clott in the formation of FAMCO II. At the outset, Clott owned 49% of the outstanding stock of FAMCO II while five other individuals owned the other shares. In March of 1984, Clott became the owner of 51% of the outstanding stock of FAMCO II, with four other stockholders owning 12¼% each.

Throughout the corporate life of FAMCO II, Clott controlled the corporation, its subsidiaries and its affiliates. He was the dominant figure in operating and managing the business of the various debtors, and all major decisions were made by him. At Clott's direction, corporate funds were from time to time transferred from FAMCO II to MH Mortgage (which remained wholly owned by him) and to other entities. Other directors had little to do with the business operations of FAMCO II and were not aware of the magnitude and extent of the fraudulent activity which was at the very core of the debtor's corporate existence.

As Chairman and Chief Executive Officer of these various corporate entities, Clott, operating through FAMCO II, defrauded both large and small corporate institutions during the years 1983 to 1985, as well as countless numbers of individual investors. Both Hutton and Equitable suffered substantial losses as a result of Clott's fraudulent and criminal activities. Shortly after the bankruptcy of FAMCO II, each accused the other of participating in Clott's frauds. In the *Hutton* case, this Court concluded that there was no credible evidence of actionable wrongdoing by either Equitable or Hutton. 678 F.Supp. at 572. Although Equitable had learned of various irregularities in the debtor's operations and although some of its employees may have suspected that Clott was engaged in fraudulent activity, Equitable had no knowledge of actual fraud on the

---

**1.** For example, *see E.F. Hutton Mortg. Corp. v. Equitable Bank, N.A.*, 678 F.Supp. 567 (D.Md. 1988); *E.F. Hutton Mortg. Corp. v. Pappas*, 690 F.Supp. 1465 (D.Md.1988); *Stratton v. Sacks*, 99 B.R. 686 (D.Md.1989); *Stratton v. Miller*, 113 B.R. 205 (D.Md.1989), *aff'd without opinion*, 900 F.2d 251 (4th Cir.1990); *Stratton v. Equitable Bank*, 104 B.R. 713 (D.Md.1989), *aff'd without opinion*, 912 F.2d 464 (4th Cir.1990).

debtor's part. As the Court noted in the *Hutton* case, it would have made little sense for Equitable with knowledge that it was being defrauded to have continued to lend large sums of money to Clott and the corporations he controlled until shortly before bankruptcy proceedings were instituted. 678 F.Supp. at 580.

It was during the summer of 1985 that FAMCO II began to experience serious financial difficulties. Hutton had restricted its purchases of mortgages, and Equitable had been hesitating to extend further credit to Clott and his corporate entities. Negotiations between Equitable and Clott concerning a possible merger, acquisition or other joint enterprise failed. In July 1985, Equitable and FAMCO II entered into the so-called Mortgage Sale Service and Repurchase Agreement (hereinafter "the MSSR"). Through the MSSR, Equitable agreed to lend funds to FAMCO II for the purpose of originating mortgage loans; FAMCO II would then use the funds provided to originate new loans, and FAMCO II would then sell the loans to Equitable to be held as collateral for sums borrowed by the debtor. FAMCO II agreed to provide servicing for these mortgage loans, by collecting payments of principal and interest (including prepayments) and making monthly remittances or advances to Equitable. Under the agreement, FAMCO II was to attempt to locate ultimate purchasers of these loans.

Between July of 1985 and FAMCO II's cessation of operations on November 15, 1985, Equitable advanced more than $15 million to the debtor, either under the MSSR or as so-called Working Capital Loans (hereinafter the "WCL"). The WCL consisted of two loans made by Equitable to FAMCO II in October and November of 1985. On or about October 9, 1985, Equitable made a $1.5 million loan to FAMCO II, and on November 4, 1985, Equitable advanced an additional $400,000. The WCL was secured by mortgages held by Equitable in its FAMCO II portfolio and by a confessed judgment note executed by Clott and his wife individually. Sums loaned under both the MSSR and the WCL were advanced so that FAMCO II might continue its business operations. When evidence of irregularities and possible fraud came to the attention of Equitable, it declined to extend further credit to Clott and his various entities, and bankruptcy proceedings were commenced shortly thereafter.

Clott was later charged with criminal fraud and racketeering in two separate indictments returned in this Court. He pled guilty and was subsequently sentenced to 12½ years imprisonment. Two other officers of FAMCO II, namely Jerry L. Gaultney and Thomas J. Polvinale, also entered pleas of guilty to charges of criminal fraud and have also been sentenced by a judge of this Court. George Schnabel, another officer, was convicted by a jury in this Court of criminal fraud and has also been sentenced. Gaultney had been President of FAMCO II, Polvinale had been its Chief Financial Officer, and Schnabel was an Executive Vice President.

Equitable has previously been sued in this Court not only by Hutton but also by certain institutional investors of FAMCO II. Civil actions were brought against Equitable by First Federal Savings & Loan Association of Brainerd, Yankton Savings & Loan Association, Pioneer Federal Savings & Loan Association and Yankee Bank for Finance & Savings. *See* Civil Nos. H–85–4708, H–86–301 and H–86–3531. In the *First Federal Savings* Opinion of April 5, 1988 entered in Civil Nos. H–86–301 and H–86–3531 1988 WL 167703, this Court concluded that Equitable was entitled to summary judgment as to the claims of fraud and breach of fiduciary duty asserted against it by these savings and loan associations. This Court there determined that no actionable fraud existed because the evidence indicated that FAMCO II had fraudulently persuaded Equitable to make improper transfers of the plaintiffs' funds and that Equitable had acted to protect the plaintiffs' interests when it discovered the deception. (Slip Op. at 21). This Court further concluded that the plaintiffs' claims of breach of con-

tract and negligence could not be finally determined in those suits by way of a motion for summary judgment. Those claims were accordingly scheduled for trial. Thereafter, all four of the savings and loan associations in question settled before trial their disputes with Equitable.

104 B.R. 713, 718–20.

7. The instant complaint sets forth three causes of action in three counts: breach of contract in Count 1 and breach of fiduciary duty in Count 2 against F.S.G., Lambert and Stillman; and the imposition of a constructive trust against Equitable in Count 3. The breach of contract claim is for failure to deliver the insured second deed of trust notes, a copy of the truth-in-lending statement, an amortization schedule and a certificate of insurance. The breach of fiduciary duty claim is for failure to properly investigate FAMCO, the entity to which F.S.G. tendered the Rosenbergers' investment, failure to deliver the insured promissory notes and failure to disclose the risks inherent in the investment of their funds. The constructive trust claim is based upon the Bank's receipt of notes which Equitable knew or should have known belonged to the Rosenbergers. The defendants have denied all allegations.

8. Maryland National Bank, successor to Equitable, filed a motion for summary judgment [P. 34] on January 18, 1991 as to Count 3, the only count in the instant complaint in which Equitable Bank is named. The plaintiffs have not responded to the motion.

9. The Bank stated in its memorandum filed with the motion that the plaintiffs have asserted no evidence to support their charge that Equitable "knew or should have known" of the previous assignment of mortgage notes to the plaintiffs. Memorandum [P. 35]. Exhibit B to the memorandum is the transcript of a deposition of Mrs. Rosenberger in which she testified that she did not have personal knowledge of any factual basis for the plaintiffs' allegation of knowledge on the part of Equitable.

## CONCLUSIONS OF LAW

1. The granting of the Bank's motion for summary judgment is appropriate in this case because there is no genuine dispute as to a material fact, i.e. that the defendant knew or should have known of the debtor's fraud, and therefore the Bank is entitled to a judgment as a matter of law. *Miller v. F.D.I.C.*, 906 F.2d 972 (4th Cir.1990); Fed.R.Civ.P. 56.

2. In the case of *E.F. Hutton Mortg. Corp. v. Equitable Bank, N.A.*, 678 F.Supp. 567 (D.Md.1988), Judge Harvey held:

> Other than conclusory allegations contained in the amended complaint, Hutton has not explained and has not supported or substantiated its claim of conversion alleged in Count IX. Conversion is an intentional tort. *See Keys v. Chrysler Credit Corp.*, 303 Md. 397, 414, 494 A.2d 200 (1985). The record here is totally devoid of facts indicating that Equitable acted intentionally to deprive Hutton of the use of any property. The funds in FAMCO's bank accounts did not belong to Hutton, and Equitable did not know of nor participate in Clott's fraudulent activity. Summary judgment will thus be granted in favor of Equitable as to Count IX.

*Id.* at 583–84.

3. There is no evidence in the record to suggest that Equitable Bank knew or should have known that the two deed of trust notes in question had been previously assigned to the plaintiffs.

4. The late Professor Austin Wakeman Scott in his famous treatise on trusts provided the following discussion on the attributes of constructive trusts:

> An express trust is a fiduciary relationship with respect to property, arising as a result of a manifestation of an intention to create it and subjecting the person in whom the title is vested to equitable duties to deal with it for the benefit of others. On the other hand, a constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly

enriched if he were permitted to retain it. In both cases the person who has the title to the property is under an equitable duty to deal with it for the benefit of another person. To this extent the two types of trusts are similar. In other respects, however, they differ. An express trust arises because the parties intended to create it. A constructive trust is not based upon the intention of the parties but is imposed in order to prevent one of them from being unjustly enriched at the expense of the other. In the case of an express trust the trustee ordinarily has active duties of management. In the case of a constructive trust, the duty is merely to surrender the property. A constructive trust, unlike an express trust, is not a fiduciary relation. The circumstances that give rise to a constructive trust may, but do not necessarily, involve a fiduciary relation.

Where a person wrongfully acquires title to property, he may be compelled to hold the property upon a constructive trust for the person wronged, even though the property was not assignable by him and he could not have created an express trust of it . . .

A constructive trust, as we have seen, is imposed in order to prevent unjust enrichment. This unjust enrichment may arise out of the wrongful acquisition of the title to property. This is the case where the title is acquired by fraud, duress, or undue influence, by the wrongful disposition of another's property, or by a person in a fiduciary relation to another in violation of his duty as fiduciary. A constructive trust may arise, however, even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it, [citing for the latter proposition the cases of *National Life Ins. Co. v. Tower*, 251 F.Supp. 215 (D.Md.1966), *Maryland Nat. Bank v. Tower*, 374 F.2d 381 (4th Cir.1967) and *Bowie v. Ford*, 269 Md. 111, 304 A.2d 803 (1973), among others].

V *Scott on Trusts*, §§ 462.1, 462.2 (4th ed. 1989).

5. A constructive trust may not be imposed according to the facts of the instant case. None of the cases cited in *Scott on Trusts* is applicable to the facts of the instant case. The Bank has neither been shown to have committed fraud, nor to have aided the debtor in committing fraud, nor to have been unjustly enriched at the plaintiff's expense.

6. The priority of conflicting security interests in the same collateral is governed by U.C.C. Section 9–312(5)(a):

(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

MD.COMM.LAW CODE 9–312(5)(a) (1991 cum. supp.).

7. "Article Nine of the UCC, which defines secured transactions and regulates conflicts among creditors, does not require that the first priority creditor be without knowledge of other interests; rather, priorities are determined on the basis of a filing structure, and knowledge is irrelevant." *In re Wathen's Elevators*, 32 B.R. 912, 920–21 (Bankr.D.Ky.1983).

8. "Despite massive litigation and extensive discovery among the Trustee, E.F. Hutton, and countless others, there has never been any evidence that Equitable knew of the fraud. The Rosenbergers have adduced no facts to the contrary. No rational jury could return a verdict for them on their contention that Equitable knew or should have known of their pur-

ported purchase of the two notes." Memorandum [P. 35] at 6.

The Bank is therefore entitled to have the case against it dismissed.

ORDER ACCORDINGLY.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT AS TO MARYLAND NATIONAL BANK

Based upon the Memorandum Opinion entered simultaneously herewith and for the reasons stated therein, it is

ORDERED that Maryland National Bank's motion for summary judgment is hereby GRANTED; and it is further

ORDERED that the instant complaint is hereby DISMISSED as to Maryland National Bank.