**In re FIRST AMERICAN MORTGAGE CO., INC., Debtor.**

**NATIONSBANK, N.A., Plaintiff,**

v.

**AMES SAVINGS AND LOAN ASSN., et al., Defendants.**

Bankruptcy No. 85–B–1987.
Adversary No. 86–0092B.

United States Bankruptcy Court,
D. Maryland.

June 11, 1997.

David P. King, Hogan & Hartson, L.L.P., Baltimore, MD, for Nationsbank, N.A.

Alan M. Grochal, Melissa G. Brault, Tydings & Rosenberg, Louis B. Price, Brocato, Price & Bushel, Baltimore, MD, for Claimants.

### MEMORANDUM OPINION GRANTING JUDGMENT TO NATIONSBANK, N.A.

JAMES F. SCHNEIDER, Bankruptcy Judge.

The instant complaint was brought by Equitable Bank [now Nationsbank, N.A.] against 77 defendants to determine the ownership of funds in the amount of $458,732.05, which the Bank setoff prepetition against mutual claims that existed between the Bank and the debtor. At the time of this opinion, there remain only six defendants (the "Remaining Defendants"), namely, Ames Savings Bank, F.S.B. (successor to Ames Savings and Loan Association); Met-

ropolitan Federal Bank of Minnesota, F.S.B. (successor to First Federal Savings and Loan Association of Grand Rapids); Metropolitan Federal Bank of Iowa, F.S.B. (successor to Pioneer Federal Savings and Loan Association); Community Federal Savings and Loan Association; Yankton Savings and Loan Association of Yankton, South Dakota; and the Federal Deposit Insurance Corporation (successor to the Resolution Trust Corporation as receiver of Statesman Federal Savings Bank, successor to Perpetual Savings and Loan Association, and receiver of First Federal Savings and Loan Association of Thief River Falls). For the reasons stated, the complaint will be granted in favor of the Bank and the claims of the Remaining Defendants will be disallowed. Stipulations of fact submitted by the parties have been adopted by this Court as Findings of Fact Nos. 1–17.

*FINDINGS OF FACT*

1. This case arose from the collapse of First American Mortgage Company ("FAMCO"). FAMCO, its predecessor (initially named First American Mortgage Company and, after October 1982, named MH Mortgage Company), its affiliates, and its subsidiaries, were in the business of extending credit secured by mortgage interests in the borrowers' residences. FAMCO frequently lent to individuals with poor credit backgrounds and received junior lien positions on their properties. The portfolio involved high risk of default as well as higher than usual prepayments by borrowers.

2. Equitable Bank, N.A. ("Equitable"), predecessor to Plaintiff, was the banker for FAMCO, MH Mortgage, and the many FAMCO subsidiaries (the "FAMCO Entities"). In November 1985, Equitable had outstanding substantial credit to FAMCO. The FAMCO Entities maintained various bank accounts at Equitable.

3. FAMCO had a separate mortgage servicing company named FAM Mortgage Servicing ("FAMMS"). Its function was to service the mortgages originated by FAMCO. The Remaining Defendants had contractual relationships with FAMMS pursuant to which they received payments on the mortgages they held.

4. The mechanics of payment receipt at Equitable were as follows: payments were received from borrowers in a lockbox (a post office box to which only Equitable had access) maintained in the name of FAMMS. As set forth in paragraph 37 of the complaint, the lockbox account was set up at Equitable for the collection of principal and interest payments on outstanding mortgages that FAMMS was servicing for third parties, including the Remaining Defendants, and the funds contained in the lockbox account were payments received from FAMCO borrowers. The lockbox funds were, pursuant to standing instructions of FAMMS, automatically transferred to the FAMMS demand deposit account, where they were commingled with other FAMCO Entities. Equitable knew that FAMCO's source of funds, in large part, consisted of the monies it so collected from FAMCO borrowers which it then transferred into its various checking accounts. At the end of each month, FAMMS gave instructions to Equitable regarding payment of the funds to other financial institutions, including Equitable, that held FAMCO mortgages. Those payments were frequently, but not always, made from the FAMMS demand deposit account.

5. The Remaining Defendants purchased mortgages from FAMCO that were serviced by FAMMS. The Remaining Defendants had mortgage Servicing Agreements with FAMMS. Attached hereto is a copy of the prototype Mortgage Servicing Agreement entered into between FAMMS and the Remaining Defendants.[1] Equitable was not a party to the Mortgage Servicing Agreements but had knowledge that same existed. The Mortgage Servicing Agreements, *inter alia*, required FAMMS to hold "in trust" the funds collected from the mortgagees for benefit of the Remaining Defendants and to remit them to the Remaining Defendants on a monthly basis. The Mortgage Servicing Agreement further provided that "[n]o mon-

---

**1.** A copy of a prototype mortgage servicing agreement is attached as an appendix to this opinion.

eys relating to Mortgage Loans being serviced for the Remaining Defendants shall be commingled with the moneys of FAMMS."

6. Initially, FAMMS forwarded to holders of FAMCO mortgages (including the Remaining Defendants) the payments that had been received in a given month from borrowers whose notes those holders owned. That practice was discontinued, however, and FAMMS began sending the holders of the mortgages (including the Remaining Defendants) a lump sum payment representing all amounts that were due in a given month on all mortgages owned by the holder.

7. None of the Remaining Defendants opened a trust account at Equitable to receive payments from FAMCO borrowers, which would have specially segregated payments received from persons whose mortgages the Remaining Defendant owned.

8. None of the Remaining Defendants established a trust account with Equitable to receive FAMCO payments. Funds received representing payment on mortgages owned by the Remaining Defendants were automatically placed into the FAMMS checking account and used in the ordinary course of FAMMS' operations.

9. During the summer of 1985, the FAMCO Entities experienced severe financial difficulties. Equitable expressed a willingness to increase its funding to the FAMCO Entities and, in July 1985, Equitable and FAMCO entered into a Mortgage Service Sale and Repurchase Agreement.

10. Between July and November 1985, Equitable made advances to FAMCO pursuant to the Mortgage Sale Service and Repurchase Agreement, and two working capital loans, in excess of $15,000,000. The working capital loans consisted of a $1,500,000 advance on October 9 and a $400,000 advance on November 4. They were secured by mortgages held by Equitable in its FAMCO portfolio.

11. On November 15, 1985, at 8:32 a.m., Equitable set off against FAMCO's debts the funds then on deposit in the FAMCO Entities' accounts. These amounts included $237,067.51 in the FAMCO checking account and $221,664.54 in the FAMMS servicing lock-box account (into which the daily lock-box receipts were deposited). (These two accounts are collectively referred to as the "Accounts.") [2]

12. On November 15, 1985, FAMCO ceased doing business. On December 3, 1985, FAMCO filed a Chapter 11 bankruptcy petition. On July 31, 1986, the case was converted to a proceeding under Chapter 7.

13. On March 24, 1986, Equitable filed the instant complaint seeking a declaratory judgment establishing the rights to the funds in the Accounts as of the time of the setoff. The 77 defendants included the FAMCO entities and all other parties that Equitable believed might have a claim to any funds in the Accounts.

14(a). Paragraph 42 of the Complaint recited: "Upon information and belief, some of the funds in the FAMCO checking accounts and in the FAM Servicing lockbox account may belong to or may be owed to parties other than FAMCO or FAM Servicing. These other parties may have a right superior to that of Equitable Bank to some portion of the funds in the accounts in question. Equitable Bank has reason to believe that some of these accounts contained principal and interest payments collected by FAM Servicing and FAMCO from mortgagors which are owed to the ultimate purchasers of the mortgage notes. Moreover, some funds in these accounts may be owed to purchasers of mortgage notes from FAMCO under other arrangements."

14(b). Paragraph 44 of the Complaint further recited: "Equitable Bank does not have sufficient information to determine to whom the funds in the accounts in question belong. Equitable Bank asserts that it has a right to any of the funds which are found to belong to FAMCO or FAM Servicing to the extent of their outstanding obligations to Equitable."

14(c). Neither Equitable nor the Remaining Defendants have been able to identify or

---

**2.** Due to an administrative oversight, four accounts containing approximately $58,000 were not set off. Those accounts were set off by Equitable in 1991, with the consent of FAMCO's trustee in bankruptcy, after this Court granted a motion to lift the stay and permit the setoff.

match the funds that were in the accounts on the day of the setoff to specific payments by FAMCO mortgagors which monies would be owed to the ultimate purchasers of the particular mortgage notes including the Remaining Defendants.

15. Equitable also filed an interpleader action in the U.S. District Court for the District of Maryland, seeking a determination of the rights of parties to funds that Equitable received in the lockbox after the bankruptcy. Unlike the prepetition lockbox receipts, those funds had been segregated by Equitable and maintained intact pending disposition by the court.

16. The funds received in the lockbox after the petition date and their proposed distribution were the subject of a report prepared by Martinelli & Associates in *Equitable Bank, N.A. v. E.F. Hutton, et al.,* Civil NO. H–86–786. Attached hereto is an excerpt from this report.[3] A total of $654,-887.01 in net funds were located. Of these, the Remaining Defendants were allocated $128,299.68 which represented 19% of the total funds in the lockbox.

17. On January 18, 1991, Equitable moved for summary judgment. Only the Remaining Defendants opposed the motion. This granted the motion by consent as to the Trustee and by default as to all other parties except the Remaining Defendants.

18. By amended order [P. 125] entered December 23, 1994, this Court granted the Bank's motion for summary judgment and deferred "abstention from the portion of the complaint still remaining until January 19, 1995." Amended order [P. 125].

19. Believing itself unable to grant summary judgment to the Bank or to the Remaining Defendants upon the record, this Court scheduled the remainder of the complaint for trial by a scheduling order [P. 128] entered April 10, 1995, which scheduled a week-long trial to begin on November 27, 1995.

20. After conducting discovery, and on the very eve of trial, Alan M. Grochal, counsel for the FDIC, sent the following letter to the Court dated November 9, 1995, on behalf of all parties:

I am writing to you on behalf of all counsel concerning the above-captioned matter which is currently scheduled for trial commencing on November 27, 1995. As has been reported to you on behalf of all counsel by Mr. King in several status reports, the parties have propounded discovery requests on each other, and there have also been several meetings between respective counsel concerning how this case should proceed. Due to the fact that nearly ten years have elapsed since this action was filed, there are few, if any, witnesses who have personal knowledge of the allegations in the complaint, and there are few, if any, probative documents still in existence. The documents and testimony that have come to light in the course of discovery are not contested by either side. While there are disagreements between the parties as to the weight to be accorded to a particular fact or whether it is relevant at all, the parties are in a position to stipulate to all facts that are to be brought before the Court.

In such circumstances, the parties believe that a lengthy trial as contemplated in the Court's Scheduling Order is no longer necessary. Rather, the parties believe that the matter can be more appropriately presented to the Court by means of a joint stipulation of fact coupled with a legal memorandum by each side. Accordingly, we believe that it would be appropriate for the Court to cancel the trial scheduled for November 27, 1935, and issue a new, abbreviated Scheduling Order that would cover legal briefs and, if warranted, oral argument.

Letter dated November 9, 1995.

21. On November 30, 1995, the parties submitted Stipulations of Fact [P. 137] adopted herein as Findings of Fact Nos. 1–17.

22. A review of the claims register in this case indicates that on June 4, 1986, the Remaining Defendants filed the following

---

3. The excerpt is contained in an appendix to this opinion.

claims: Yankton Savings and Loan Association of Yankton, South Dakota, filed Claim No. 553 in the amount of $995,242.50; First Federal Savings and Loan Association of Grand Rapids, Minnesota, filed Claim No. 554 in the amount of $1,770,314.48; Community Federal Savings and Loan Association of Little Falls filed Claim No. 555 in the amount of $3,017,523.19; First Federal Savings and Loan Association of Thief River Falls filed Claim No. 556 in the amount of $897,953.47; AMES Savings and Loan Association filed Claim No. 557 in the amount of $843,947.68; Perpetual Savings and Loan Association filed Claim No. 558 in the amount of $9,188,711.16; and Pioneer Federal Savings and Loan Association filed Claim No. 560 in the amount of $4,997,131.86.

*CONCLUSIONS OF LAW*

1. This Court has subject matter jurisdiction to hear and determine the instant dispute between creditors regarding the ownership of money that was at one time claimed to be property of the bankruptcy estate by the bankruptcy trustee, a claim which the trustee later abandoned. This complaint, brought to test the propriety of the plaintiff's prepetition setoff of mutual debts between it and the debtor, is "related to" the bankruptcy case pursuant to 28 U.S.C. § 1334(b) because its outcome might affect the claims the defendants filed against the debtor. *Trans-Ohio Savings Bank v. Huntington Nat. Bank (In re Cardinal Industries, Inc.),* 126 B.R. 754 (Bankr.S.D.Ohio 1991). Were this Court to determine the prepetition setoff by Equitable to have been improper, the plaintiff could be subject to an order of court requiring disgorgement.

By filing proofs of claim, the Remaining Defendants implicitly consented to the jurisdiction of the U.S. bankruptcy court. In this case, both the plaintiff and the Remaining Defendants have *explicitly* consented to the jurisdiction of this Court to enter a final order disposing of the instant controversy. *See Canal Corporation v. Finnman (In re Johnson),* 960 F.2d 396 (4th Cir.1992)

2. Because FAMMS commingled the funds in the Accounts and used them in the ordinary course of its business operations, the Remaining Defendants cannot trace the proceeds of payments attributable to the mortgages they owned, and are unable to claim an interest in identifiable cash proceeds in the hands of the Bank.

■ 3. Likewise, because the Remaining Defendants are unable to impute any fraud or wrongdoing to the Bank, or that the Bank knew or should have known that FAMCO was guilty of fraud in its commingling of funds in the accounts maintained by the Bank, they are not entitled to have this Court impose a constructive trust in their favor upon identifiable cash proceeds held by the Bank. *Cf.* the decision of this Court in *Rosenberger v. Financial Services Group, Inc. (In re First American Mortgage Co., Inc.),* 143 B.R. 665, 669 (Bankr.D.Md.1992)(holding that a constructive trust would not be imposed upon the Bank absent any evidence that the Bank knew should have known of the debtor's previous assignment of notes to investors).

■ 4. The failure of the Remaining Defendants to require the opening of trust accounts at Equitable to receive payments from FAMCO borrowers, which would have specially identified payments received from those whose mortgages were owned by the Remaining Defendants, or to take some similar action requiring the Bank segregate the proceeds reduced the Remaining Defendants to general, unsecured creditors. They have no security interests, perfected otherwise, in the cash proceeds of their mortgages.

5. The commingled funds in the Accounts were subject to garnishment, attachment before or after judgment, or setoff.

■ 6. The right of Equitable in setting off its prepetition claim against the debtors was superior to whatever rights the Remaining Defendants had in the Accounts, in the absence of a specific agreement to the contrary or in the absence of notice to the Bank that its right to setoff was not proper. "To defeat a Bank's right of setoff on the ground that a third party has an interest in the account, it must be shown that the bank either had knowledge of the third party's interest or had knowledge of sufficient facts to put it on inquiry." *In re Anton,* 146 B.R.

509, 513 (Bankr.E.D.N.Y.1992) (citing New York law).

■ 7. In the recent case of *Citizens Bank of Maryland v. Strumpf*, 516 U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), the Supreme Court explained how setoff works in the bankruptcy context:

> The right of setoff (also called "offset") allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913). Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy. Here it is undisputed that, prior to the bankruptcy filing, petitioner had the right under Maryland law to set off the defaulted loan against the balance in the checking account.

—— U.S. at ——, 116 S.Ct. at 289, 133 L.Ed.2d at 262–263. The Court also explained that a bank account does not amount to money belonging to a depositor and held by a bank. "In fact, however, it consists of nothing more or less than a promise to pay, from the bank to the depositor." —— U.S. at ——, 116 S.Ct. at 290, 133 L.Ed.2d at 264 (*citing Bank Marin v. England*, 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966) and *Keller v. Frederickstown Sav. Institution*, 193 Md. 292, 296, 66 A.2d 924, 925 (1949)). Money deposited in a bank account is the bank's property, the deposit creating a debt owed by the bank to the depositor. *United States v. Butterworth–Judson Corp.*, 267 U.S. 387, 394, 45 S.Ct. 338, 340, 69 L.Ed. 672 (1925).

■ 8. On November 15, 1985, Equitable properly exercised its right of setoff against funds in the Accounts. In Maryland, the right to setoff has been defined as the "right which exists between two parties, each of whom, under an independent contract, owes an ascertained amount to the other, to set off their respective debts by way of mutual deduction, so that, in any action brought for larger debt, the residue only, after such de-duction, shall be recovered." *Ghingher v. Fanseen*, 166 Md. 519, 526, 172 A. 75, 78 (1934).

■ 9. Article 9 does not apply to any right to setoff, according to Section 9–104(i) of the Commercial Law Article of the Maryland Annotated Code. This provision of the Uniform Commercial Code has been construed by a majority of courts "by holding that a creditor may have a right to setoff without complying with the security agreement and filing provisions of Article 9, although the priority of such a setoff is to be determined under that Article's priority provisions." *Zions First National Bank, N.A. v. Christiansen Brothers, Inc. (In re Davidson Lumber Sales, Inc.)*, 66 F.3d 1560, 1565 (10th Cir.1995).

■ 10. The Bank's prepetition setoff was neither a voidable preference nor a fraudulent transfer. "In general, a prepetition setoff is not avoidable as a preference under section 547, or as a fraudulent transfer under section 548 or 544." 5 *Collier on Bankruptcy* ¶ 553.09[1] (15th ed.1996). "[A] valid setoff executed within 90 days of the date of the filing of a bankruptcy petition is nonetheless protected from avoidance under section 547, except for any insufficiency.... Only if the court finds the setoff invalid, and further concludes that no right of setoff exists in bankruptcy, is section 547 applied." *Durham v. SMI Industries Corp.*, 882 F.2d 881 (4th Cir.1989). See also *Petersen v. State Employees Credit Union (In re Kittrell)*, 115 B.R. 873 (Bankr.M.D.N.C.1990) (quoting *Durham v. SMI Industries Corp.*, 882 F.2d 881, 882 (4th Cir.1989)) ("Where a pre-petition setoff is asserted in defense to a proceeding brought by a trustee the court must first determine whether the setoff is valid under section 553. Only if the court finds the setoff invalid, and further concludes that no right of setoff exists in bankruptcy, is section 547 applied."). *Barber v. Princeville State Bank (In re Ostrom–Martin, Inc.)*, 161 B.R. 800 (Bankr.C.D.Ill.1993), held that because funds in a debtor's bank account that a bank setoff prepetition were not property of the debtor's bankruptcy estate, they could not be recovered by a Chapter 7 trustee

under Sections 551, 544, or 545 of the Bankruptcy Code.

11. In the case of *Stratton v. Equitable Bank, N.A.,* 104 B.R. 713 (D.Md.1989), *aff'd* 912 F.2d 464 (4th Cir.1990), an action brought by FAMCO's Chapter 7 trustee against Equitable to avoid the instant setoff as a fraudulent conveyance, Chief U.S. District Judge Alexander Harvey, II, granted summary judgment to the Bank. In the course of the opinion, the court stated:

> In any event, the set-off in question clearly appears to be one involving mutual debts. Equitable set off funds existing in typical demand deposit accounts. FAMCO had borrowed money from Equitable, thus creating a debt by FAMCO to Equitable; FAMCO had deposited those funds with Equitable in ordinary checking accounts, thus creating a debt by Equitable to FAMCO. The Court can perceive no inequity in permitting Equitable to retain this set-off.

104 B.R. at 733 n. 17.

12. The Remaining Defendants were public financial institutions well aware of what was legally required of them to perfect valid security interests in funds that the debtor maintained in accounts at the Bank. In spite of this knowledge, the Remaining Defendants did not enforce the requirement that the debtor take action to segregate the funds in which the Remaining Defendants claimed an interest in trust accounts for their benefit at the Bank.

13. In the case of *E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.,* 678 F.Supp. 567 (D.Md.1988), Chief Judge Harvey found as a matter of law that funds in the debtor's accounts at Equitable were not held in trust for Hutton or any other purchasers of mortgages, that Equitable owed no fiduciary duty to Hutton or any other purchasers of mortgages, and that "Equitable had no knowledge that FAMCO was engaging in fraudulent activity in drawing checks on its various accounts[,][n]or was Equitable in possession of facts indicating that in permitting FAMCO to draw on the accounts, it (Equitable) was acting in bad faith." 678 F.Supp. at 582.

14. As this Court stated in its opinion in the case of *Rosenberger v. Financial Services Group, Inc. (In re First American Mortgage Co.),* 143 B.R. 665 (Bankr.D.Md. 1992), "[t]he Bank has neither been shown to have committed fraud, nor to have aided debtor in committing fraud, nor to have been unjustly enriched at the plaintiff's expense." 143 B.R. at 670.

Having sustained substantial losses in its dealings with FAMCO, Equitable was as much a victim of the debtor's fraudulent misconduct as were the Remaining Defendants. As between the parties, all of which were innocent, Equitable holds a claim to the funds in its possession that is far superior to the claims of the Remaining Defendants, based upon the Bank's vigilance. As found by this Court, Equitable perfected its claim to the funds in the FAMCO accounts by properly exercising its prepetition right of setoff.

For the foregoing reasons, the instant complaint will be granted, the claims of the Remaining Defendants to the funds in question will be disallowed, and a judgment will be entered in favor of the Bank.

ORDER ACCORDINGLY.

## APPENDIX

## MORTGAGE SERVICING AGREEMENT

### (Savings and Loan)

THIS MORTGAGE SERVICING AGREEMENT dated March 29, 1985, (the "Agreement") is entered into by and between *The Perpetual Savings and Loan Association,* ("Owner") and FAM MORTGAGE SERVICING INC., a Maryland corporation ("FAM").

### *WITNESSETH*

WHEREAS, Owner from time to time purchases mortgage loans and wishes to provide for servicing of such mortgage loans, and FAM is engaged primarily in the business of servicing residential mortgage loans, and

WHEREAS, Owner desires from time to time to place mortgage loans with FAM for

servicing, and FAM agrees to service such mortgage loans;

NOW, THEREFORE, in consideration of the premises and of the mutual and several agreements of the parties, it is hereby agreed with respect to each mortgage loan hereafter made subject to and governed by this Agreement as follows:

Section 1. *Representations, Warranties and Covenants by Owner.* Owner represents and warrants to, and covenants with, FAM that:

(a) Owner is a corporation duly chartered Savings and Loan Association; it has full power to enter into this Agreement and the executive and delivery of this Agreement have been duly authorized by all necessary corporate action; and

(b) The execution and delivery of this Agreement and consummation of the transactions contemplated thereby, and the fulfillment of or compliance with the terms and conditions of this Agreement, do not conflict with or result in and breach or violation of any of the terms, conditions or provisions of any applicable laws, including regulations, or of any agreement or instrument to which Owner is not a party or by which it is bound or constitute a default under any of the foregoing.

Section 2. *Representations, Warranties and Covenants by FAM.* FAM represents and warrants to, and covenants with, Owner that:

(a) FAM is a corporation duly organized and existing under the laws of Maryland; it is duly authorized to transact business in Maryland, including the servicing of residential mortgage loans and it is generally engaged in the business of servicing mortgage loans;

(B) FAM has the power to accept the terms of this Agreement, to execute and deliver this Agreement, to enter into the transactions contemplated by this Agreement, and the acceptance and performance of this Agreement have been duly authorized by all necessary corporate action;

(c) The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the fulfillment of or compliance with the terms and conditions of this Agreement, do not conflict with or result in any breach or violation of any of the terms, conditions or provisions of any applicable laws, including regulations, or of any agreement or instrument to which FAM is now a party or by which it is bound, or constitute a default under any of the foregoing.

Section 3. *Appointment; Scope of Agreement.* Owner hereby appoints FAM as its agent with respect to the servicing of all mortgage loans made subject to and governed by this Agreement (the "Mortgage Loans"). This Agreement shall cover and govern all Mortgage Loans delivered to FAM hereunder. This Agreement shall apply and be construed separately as to each of the Mortgage Loans governed hereby in the same manner as though a separate agreement, with terms and provisions as herein contained, was executed and delivered for each such Mortgage Loan.

Section 4. *Duties of FAM.* FAM, for the compensation hereinafter specified, shall service each Mortgage Loan subject hereto while it is covered and governed hereby and shall perform all duties and acts incident to the servicing of such Mortgage Loans that a reasonable and prudent mortgagee would perform with respect to its Mortgage Loans, all subject to and in accordance with the provisions of this Agreement. Without limiting the generality of the foregoing, the duties and obligations to be performed by FAM shall include the following:

(a) *Collections.* FAM shall take all reasonable actions in order to collect, as and when due, all payments called for under the terms and provisions of the Mortgage Loans.

(b) *Remittances; Reports.* FAM shall remit to Owner on the fifth business day of each calendar month all moneys collected by FAM on or with respect to the Mortgage Loans governed hereby (other than any payments required to be held in escrow and that portion of the payments which FAM is permitted to retain as its servicing fee as hereinafter provided). If any such date of remittance falls on Satur-

day, Sunday or a legal holiday in Maryland, or a day on which Owner or FAM is obligated by law or executive order to close, such remittance shall be made at the opening of business on the next succeeding business day. Within five business days after the end of each month, FAM shall prepare and sumit to Owner a reconciliation of all amounts due and payable during the period from the fifteenth of the preceding month through the fifteenth of that month on or with respect to the Mortgage Loans with all amounts actually collected during such period.

(c) *Holding of Funds.* All moneys, checks or other payments collected with respect to Mortgage Loans shall be held in trust by FAX for the benefit of Owner and (to the extent required by the mortgage) for the benefit of the Mortgagor as applicable, until deposited or applied or disposed of by FAX in accordance with the terms of this Agreement and, where applicable, in accordance with the terms of the Mortgage. No moneys relating to Mortgage Loans being serviced for Owner shall be commingled with the moneys of FAM. All monthly escrow payments made by a mortgagor to provide for the annual payment of taxes, hazard insurance premimums, mortgage insurance premiums, ground rent, etc. (the "Escrow Payments") shall be held by FAM in trust for the benefit of such mortgagor. FAM shall furnish statements showing the status of each Mortgage Loan with respect to interest, principal and escrow deposits at any time on request of Owner.

(d) *Mortgage Loan File.* FAM shall maintain an individual file for each Mortgage Loan containing all documents with respect to the Mortgage Loan received from Owner and all correspondence concerning the Mortgage Loan received or sent by FAM.

(e) *Insurance.* FAX shall take reasonable action to assure that the required insurance coverage for each mortgage securing a Mortgage Loan (the "Mortgage") is maintained as to each Mortgage Loan. In the event of any losses covered by any insurance policies, FAM shall comply with any instructions issued by Owner with respect to notification to be given of loss or damage, adjustment of claims, dispositions of the proceeds of such policies and repair of damage.

(f) *Private Mortgage Insurance.* FAM will take all steps necessary to obtain and keep private mortgage insurance in force. FAM shall deduct from each monthly payment received on any designated Mortgage Loan a percentage, designated by Owner, to be used as payment for private mortgage insurance. Such funds shall be deducted, retained and paid as directed by Owner or pursuant to the instructions contained in any private mortgage insurance policy provided by Owner to FAM. All such funds held by FAM shall be held in escrow for owner as provided in Section 4(h).

(g) *Release of Property or Mortgages.* FAM may, with the prior written consent of Owner, amend the terms or conditions of any Mortgage Loan, release or direct the release of property from the lien of Mortgage or consent to the grant of, or grant easements or rights-of-way upon, property securing a Mortgage Loan. Upon payment or prepayment of all moneys due under a Mortgage Upon, FAM shall effect the proper delivery to the person entitled thereto of the appropriate documents of satisfaction or release of the Mortgage executed by the appropriate party. In such event, FAM shall take all necessary and proper action to discharge or release the Mortgage and, within five business days after the date on which FAM discharges or release such Mortgage, FAM shall advise Owner in writing of such discharge and release.

(h) *Escrow for the Payment of Taxes, etc.* From any Escrow Payments made in accordance with a Mortgage with respect to which Owner has provided written notice to FAM that Escrow Payments are due, or from monies collected pursuant to Section 4(f), FAM shall make payment of such items as taxes, ground rents, hazard insurance premiums, private mortgage insurance premiums or any other items required to be paid from such Escrow Pay-

ments under the terms of such Mortgage, promptly as each becomes due and payable. If any Escrow Payments collected are insufficient for the payment of such items and the Mortgage secures advances made by the mortgage for such items, FAM, to the extent necessary to protect the interest of Owner, may, but shall not be required to, advance its own moneys for the payment thereof, for which advances FAM shall be entitled to reimbursement with interest, if interest is permitted by the Mortgage. In the event such amounts are not paid due by mortgagor, FAM shall promptly notify Owner of such failure and identify the steps taken to correct such failure. FAM shall make reasonable efforts to secure the repayment of such advances from the applicable mortgagor. FAM shall analyze each such Mortgage Loan at least annually to determine whether moneys are being collected as Escrow Payments in an amount sufficient to provide for the prompt payment of all items that are required to be paid from such Escrow Payments and shall adjust its collections in accordance with the foregoing analysis.

(i) *Advances by FAM.* If any principal or interest payments collected are insufficient for the timely remittance of such payments to Owner, FAM may, but shall not be required to, advance its own moneys for the payment thereof, for which advances FAM shall be entitled to reimbursement. In the event such amounts are not paid by mortgagor when due, FAM shall promptly notify Owner of such failure, the fact of FAM's advance, if any, and the steps taken or to be taken to correct such failure. FAM shall make reasonable efforts to secure the repayment of such advances from the applicable mortgagor. FAM shall not advance any principal or interest payment, or part thereof, for any one mortgagor until any prior such advancements for such mortgagor have been repaid in full.

(j) *Records.* FAM shall maintain in its office adequate books and records to show the status of payments of interest, principal, Escrow Payments and all other deposit or accrual items, and the status of all other transactions relating to each Mortgage Loan. All such books and records shall be made available to owner and its agents and representatives at the office of FAM at all reasonable times for the purpose of inspection, examination, duplication and audit. FAM shall, upon demand by Owner, return all such records and documents to Owner after termination or expiration of this Agreement.

(k) *Reports and Information.* FAM shall, upon request, advise Owner of the status of any mortgage Loan or any matter relating to any Mortgage Load and promptly shall report to Owner any facts or claims coming to its attention that *might impair or are claimed to impair* the lien of a Mortgage. In addition, FAM shall notify Owner promptly of any of the following that may come to FAM's attention: any sale, lease or transfer of title of the premises subject to a Mortgage; (ii) any damage, lack of repair, deterioration or waste suffered or permitted with respect to any mortgaged premises; and (iii) any abandonment or change of occupancy of any mortgaged premises.

(1) *Compliance with Laws, etc.* FAM shall comply with all applicable federal, state and local laws, rules and regulations.

(m) *Fidelity Insurance.* FAM, at its expense, shall maintain, at all times while this Agreement is in force, a fidelity bond and an errors and omissions insurance policy covering all relevant officers, employees and other persons acting on behalf of FAM issued by a company approved by FNMA and complying with applicable standards, terms and conditions of, and in such amounts as are from time to time required for mortgage servicers by FNMA.

(n) *Late Notices and Reports.* FAM shall initiate late notices, not later than 15, 30 and 45 days from the due date, to each delinquent mortgagor. FAM shall send a report to Owner within five business days after the end of each month identifying the number and principal amount of each Mortgage Loan which such Mortgage

Loan has been delinquent (30 days, 60 days, 90 days or more than 90 days) and identifying any Mortgage Loans then having uncured, known defaults in any other respect. FAM shall furnish Owner such information and recommendations as Owner shall request.

(*o*) *Procedure on Default; Foreclosure.* Upon delinquency in payment or other default under any Mortgage Loan, FAM shall use its best efforts to cause the delinquency or default to be cured; provided, however, that no such action shall impair any insurance policy applicable to such Mortgage Loan. Any delinquent account may be referred by FAM to any attorney for collection (as distinguished from foreclosure), provided that such referral does not obligate Owner, without Owner's written permission, for the payment of collection costs and fees, that the attorney shall agree to look for his compensation to any attorney's fee collectable and collected from the mortgagor under the terms of the applicable Mortgage, and that such referral shall not impair any insurance policy applicable to such Mortgage Loan. FAM shall submit a recommendation to Owner at such time as, in its opinion, foreclosure of a Mortgage Loan is necessary. FAM shall take such actions as Owner shall direct with respect to the institution of foreclosure proceedings. Any funds received by FAM, for rent or otherwise, in connection with such duties shall be segregated and held in a special custodial bank account pending proper disposition. FAM shall be reimbursed for its reasonable expenses for performing the duties of foreclosure arid settlement by way of deeds in lieu of foreclosure.

Section 5. *Powers.* Subject to such limitations as Owner from time to time may establish in writing, FAM shall have full power and authority, acting along, to take such actions as may be necessary to discharge its duties hereunder with respect to servicing the Mortgage Loans, which powers and authority shall include (a) the right to execute and deliver customary consents or waivers and other instruments and documents required in the performance of those duties; (b) the right to consent renewals and extensions of Mortgage Loans and to transfers of the property securing the Mortgage Loans, and to execute releases from liability of any seller; (c) to collect upon any insurance policies; and (d) to effectuate foreclosure or other conversion of the ownership of property securing a Mortgage Loan and to continue servicing such foreclosed-upon property on behalf of Owner for a reasonable fee to be negotiated at the time, provided the consummation of the foregoing shall not be inconsistent with or prejudice the security interest of Owner or the rights and interest of Owner under this Agreement. FAM shall and is hereby irrevocably authorized and empowered by Owner to make and deliver or cause such instruments to be made and delivered for and on behalf of and in the name of Owner as may be necessary to consummate the foregoing.

Section 6. *Compensation: Payment of Expenses.* As full compensation for performing the services herein provided to be rendered and performed by FAM, FAM shall be entitled to receive and retain a monthly servicing fee on each Mortgage Loan serviced hereunder equal to one-twelfth ($\frac{1}{12}$) of one and one-half percent ($1\frac{1}{2}\%$) of the unpaid principal balance of such Mortgage Loan. For the purpose of computing the servicing fee, the sane principal balance shall be used as is used to compute the monthly interest payment on the Mortgage Loan for the same month and no servicing fee shall be payable to unless and until the complete monthly payment on such Mortgage Loan for such month has been collected by FAM. FAM is authorized to deduct the servicing fee from the collections received before remitting the same as provided in Section 4(b). FAM is authorized to retain late fees, bad check fees, and assumption fees as additional compensation to the extent permitted by law.

Section 7. *Term of Agreement.* Unless sooner terminated or cancelled as herein provided or by mutual agreement, this Agreement shall continue in force and effect as to each Mortgage Loan covered hereby until the interest and principal thereof and any other sums due from the mortgagor in con-

nection therewith are paid in full or until the debt secured by the mortgage is otherwise extinguished and all activities of FAM herein with respect to the disposition of the property subject to the Mortgage have been fully performed.

Section 8. *Assignment of Mortgage Loan.* Owner shall have the unconditional right to sell, convey, hypothecae, pledge, or in any other way transfer its rights in any Mortgage Loan covered under this Agreement. Owner shall advise FAM in writing in the event Owner assigns a Mortgage Loan covered and governed hereby.

Section 9. *Termination Without Cause.* Owner, at its option, shall have the right to terminate this Agreement, without cause or reason, as to any or all Mortgage Loans covered and governed hereby by giving notice to FAM of not less than 30 days and paying to FAM a termination fee in an amount equal to 1% of the total principal amount unpaid on all Mortgage Loans affected by the termination as of the effective date of such termination plus any amounts advanced by FAM on behalf of Owner for any such Mortgage Loans. FAM, at its option, shall have the right to terminate this Agreement, without cause or reason, as to any to any or all Mortgage Loans covered and governed hereby by giving notice to Owner of not less than 90 days. In the event of such termination and upon payment of such termination fee, it any, all rights and duties of FAM and its rights to further compensation hereunder shall clease with respect to the Mortgage Loans affected by such termination (but as to Mortgage Loans if any, not so affected, this Agreement and such rights of compensation shall continue in force and effect) and FAM shall transfer and deliver to or on the order of Owner all documents and moneys relating to the Mortgage Loans affected by the termination then in the possession of FAM or under its custody or control.

Section 10. *Termination for Cause.* Upon the happending of any oen or more of the following events, Owner may terminate FAM's rights under this Agreement and shall have the other remedies specified herein:

(a) Failure by FAM to deposit funds collected under any Mortgage Loan;

(b) Failure by FAM duly to observe or perform in any material respect any other covenant, condition or agreement in this Agreement to be observed or performed, other than a failure to deposit amounts collected from mortgagors, for a period of 30 days after written notice, specifying such failure and requesting that it be remedied, is given to FAM by Owner unless Owner shall agree in writing to an extension of such time prior to its expiration; provided, however, if the failure stated in the notice cannot be corrected within the applicable period, Owner will not unreasonably withhold its consent to an extension of such time if corrective action is instituted by FAM within the applicable period and diligently pursued until the default is corrected.

(c) A decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against FAM and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days.

(d) Consent by FAM to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to FAM or of or relating to all or substantially all of its property; the admission in writing by FAM of its inability to pay its debts generally as they become due; the filing of a petition by FAM to take advantage of any applicable insolvency or reorganization statute; the making of an assignment by FAM for the benefit of its creditors; or the voluntary suspension of payment of FAM's obligations.

(e) Discovery by Owner that any representation of or warranty by FAM to Owner is false in any material respect.

Section 11. *Remedies.* Whenever any event referred to in Section 10 hereof shall have happened and be continuing, Owner may take any one or more of the following remedial steps:

(a) By notice in writing delivered to FAM, Owner may terminate all of FAM's rights and obligations concerning the servicing of the Mortgage Loans. FAM agrees to cooperate with Owner in effecting the termination of FAM's servicing responsibilities hereunder, including, without limitation, the transfer to Owner of the mortgage loan files relating to each Mortgage Loan previously serviced by FAM and all cash amounts which shall at the time be held by FAM or thereafter received with respect to the Mortgage Loans.

(b) owner may take whatever other action at law or in equity as may appear necessary or desirable to collect the amounts then due under this Agreement.

Section 12. *No Remedy Exclusive.* Unless otherwise expressly provided, no remedy herein conferred upon or reserved is intended to be exclusive of any other available remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity; provided, however, that monetary damages payable to Owner from FAM shall be limited to those amounts payable pursuant to the indemnification provisions of Section 13. No delay or omission to exercise any right or power accruing under this Agreement upon the happening of any event set forth in Section 10 hereof shall impair any such right or power or shall he construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.

Section 13. *Indemnification.* FAM covenants that it shall indemnify Owner for loss, damage, or expenses (including court costs and reasonable attorneys' fees) that Owner may sustain as a result of any failure of FAM properly to perform its services, duties and obligations under this Agreement. Notwithstanding anything in this Agreement to the contrary, Owner agrees that the total amount of FAM's indemnification obligations to the Owner shall not exceed the then outstanding unpaid principal balance of mortgages owned. Each representation and warranty contained herein shall be construed to apply to each Mortgage Loan covered by this Agreement and to be representations and warranties continuing in force and effect and represented to be true and correct until written notice to the contrary is given by FAM to Owner.

Section 14. *Relationship of Parties.* Nothing contained herein shall be deemed or construed to create a co-partnership or joint venture between the parties hereto. The duties and responsibilities of FAM shall be rendered as an independent contractor and not as an employee of Owner and FAM shall have full control of all its acts, doings and proceedings relating to or requisite in connection with the discharge of its duties and responsibilities under this Agreement.

Section 15. *Procedure for Amendments.* This Agreement constitutes the entire agreement between the parties hereto, and all other communications between the parties prior to the execution of this Agreement, whether written or oral, with reference to the subject matter hereof are superseded by the agreements contained herein. No amendment of this Agreement shall be binding upon the parties hereto or either of them unless such amendment is in writing and is duly executed by the respective parties hereto.

Section 16. *Notice.* All notice to be given pursuant to this Agreement shall be in writing and shall be deemed given when actually delivered or mailed by certified or registered mail, return receipt requested, to the parties hereto at the addresses set forth below, or to such other place as a party may from time to time designate in writing.

(a) Owner:

    (b) FAM Mortgage Servicing, Inc.
       1700 Reisterstown Road
       Pomona Square, Suite 227
       Pikesville, Maryland 21208
        Attn: Michael H. Clott

Section 17. *Applicable Provisions of Law.* This Agreement shall be construed,

interpreted and enforced according to the laws of the State of Maryland.

Section 18. *Captions.* The captions of the paragraphs and sections of this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of any part of this Agreement or the intent of any provision hereof.

BOTH PARTIES hereto warrant and represent that they have full right, power, and authority to execute this Mortgage Servicing Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Mortgage Servicing Agreement as of the day and year first above written.

THE PERPETUAL SAVINGS AND LOAN ASSOCIATION

By: David D. Garvin
David D. Garvin

Its: *Executive Vice President and Secretary*

FAM MORTGAGE SERVICING, INC.

By: Gaultney
Its: President

EXHIBIT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUITABLE BANK, N.A.,
Plaintiff,

v.

E.F.HUTTON MORTGAGE CORPORATION, et at.,
Defendant.

C.A. No. H86–786

*NOTICE OF FILING OF REPORT FOR PROPOSED DISTRIBUTION OF INTERPLEADER FUNDS AND CLAIMS PROCEDURE*

PLEASE TAKE NOTICE THAT pursuant to order of this Court dated February 13, 1987, the firm of Martinelli & Associates, Ltd. have examined the records of First American Mortgage Company ("FAMCO") and of Equitable Bank, N.A. ("Equitable") with respect to mortgage payments on FAMCO-originated loans received by Equitable on or after November 13, 1985 ("Interpleader Funds").

Martinelli & Associates, Ltd. have prepared and filed with the Court a preliminary report showing the source of the payments and, according to FAMCO's records, the investors who own the loans upon which payment was made. A copy of the report is being sent to all parties in this Interpleader action. In addition, this notice if being sent to all parties on the service list in the bankruptcy case, *In re First American Mortgage Company, Inc., et al.,* case numbers 85–B–1987 and 85–B–2030 through 85–B–2047 and 86–B–0106.